In re AMERICAN FIBRE REED CO.

In re NEW ENGLAND CHAIR CO.

(District Court, E. D. Kentucky. June 19, 1913.)

Nos. 831, 832.

Bankruptcy (§ 178*)—Transfer of Accounts—Sale or Pledge—Usury.

Bankrupts, being from time to time in need of money, made out lists of accounts owing to them by customers and presented the same to intervener, which, if the accounts were acceptable, advanced to the bankrupts 75 per cent. of the face value thereof, and the accounts on the books of the company were stamped as sold to intervener. Under the contract and in practice the accounts were collected in the name of the bankrupts in the regular course of business, and the proceeds turned over to an employé, who was attorney in fact for both parties, and who at once transmitted the same to intervener. If the account was promptly paid, intervener at once took from the sum remitted the 75 per cent. of the face of the account, also 5 per cent. discount therefrom if the account was to run 120 days, or a less amount according as the time for maturity was shorter, and remitted the balance to the bankrupts; intervener being entitled, however, to withhold such remainder to make good accounts in default or where the debtor had become insolvent, in which event, or in the event of nonpayment of any account at maturity, the bankrupts obligated themselves to repurchase the account within five days after receipt of notice. *Held,* that such transaction was not a sale of the accounts, but a pledge thereof as security for money advanced.

[Ed. Note.—For other cases. see Bankruptcy, Cent. Dig. §§ 221, 264–274, 283, 284; Dec. Dig. § 178.*]

In Bankruptcy. In the matter of consolidated bankruptcy causes of the American Fibre Reed Company and the New England Chair Company, bankrupts. On exceptions to the master's report on the intervening petition of the Home Bond Company. Report confirmed.

The following is the report of Special Master D. W. Lindsey:

The Home Bond Company, by its intervening petition filed in the above-styled proceedings in bankruptcy pending in this court, asserts claim, as the owner, of certain sums of money alleged to be in the hands of H. V. McChesney, the trustee of said bankrupt estates, which claim is contested by the trustee. The contention of the intervening petitioner is that under the terms and provisions of two certain contracts with the said bankrupt corporations, respectively, the one with the New England Chair Company, dated March 6, 1911, and the other with the American Fibre Reed Company, dated November 9, 1911, it bought from each of said corporations certain accounts owing to the corporation, and that, these bankrupt proceedings having been instituted by the petitions filed February 2, 1912, and said H. V. McChesney having been by order of this court appointed custodian and afterwards the trustee of the said bankrupts' estates, he proceeded to and did collect certain of the accounts as alleged to have been purchased by the petitioner from the bankrupt corporations respectively, and now has the money so collected by him in his possession as trustee as aforesaid; that the purchases of such accounts by the petitioner from the New England Chair Company were between the dates of April 26, 1911, and November 16, 1911, inclusive, and from the American Fibre Reed Company between November 18, 1911, and January 24, 1912, inclusive; and that the amounts of such accounts so collected by the custodian and trustee from the New England Chair Company ac-

counts was $2,571.37 and from the American Fibre Reed Company accounts was $2,358.32.

The defense interposed by the trustee rests primarily upon the contention that the transactions between the petitioner and the bankrupt corporations, respectively, were not the buying by the former from the latter of the accounts, but were in substance and effect and in fact nothing more or less than the pledging of the accounts by the latter to the former for a loan, in each instance, of a certain per cent. of the face value of the accounts and at the usurious rate of not less than 24 per cent. per annum interest, with the right and duty retained and devolved upon the bankrupt corporations in their own names and at their expense to collect the accounts, the proceeds in each instance to be applied first to the payment of the amount advanced and loaned by the petitioner to the bankrupt and the stipulated interest thereon, and the "remainder" of the amounts collected being the property of and to go to the bankrupt corporation or for its benefit; that the petitioner has since these proceedings in bankruptcy were instituted itself collected a number of said accounts, and now has in its hands the money arising from such collections, amounting to $———, and also has a large number of the accounts uncollected, amounting to $———; and that if a settlement of the transactions is made between the petitioner and the bankrupt corporations, or the trustee, under the said contracts, upon a legal and equitable basis and purged of usury, but a very small sum, if anything, will be coming to the petitioner upon the surrender to the trustee of all uncollected accounts.

The two contracts, copies of which are exhibited, are upon printed forms, are identical in every respect, except as to their dates, and that the one is with the New England Chair Company and the other with the American Fibre Reed Company, and it was admitted by counsel for both parties in the argument, and is practically stated in the agreed facts, that in each instance of the alleged purchase of accounts by the intervening petitioner from the bankrupt corporations the transactions were had and made under the terms and conditions of said contracts respectively. The case is submitted to the special master upon the pleadings and exhibits and the agreed statement of facts filed, with the agreement in writing filed that the affirmative matter contained in the trustee's response to the intervening petition and amended petition is controverted of record, and after argument by counsel.

The question first to be considered is whether the transactions had between the intervening petitioner and the bankrupt corporations, under the contracts exhibited, were sales by the bankrupts to the petitioner of the accounts involved, or in the nature of pledges of such accounts as security for moneys advanced or loaned thereon to the bankrupts. The following cases cited in the brief of counsel for the trustee, to wit: Bright v. Wagle, 3 Dana (Ky.) 252; Boli v. Irwin & Son, 51 S. W. 444, 21 Ky. Law Rep. 367; McKibben v. Diltz, 138 Ky. 684, 128 S. W. 1083, 1085, 1086, 137 Am. St. Rep. 408—are in point as illustrative of the extent to which the courts have gone in holding that an instrument, purporting on its face to be a deed or bill of sale, is in effect in the nature of a mortgage or as security, and not a sale. And that the courts will penetrate devices used to cover up or conceal usury is well illustrated by the case of Missouri Valley Life Ins. Co. v. Kittle (C. C.) 2 Fed. 113, where, quoting from the syllabus, it is said: "Any agreement, device, or shift to reserve or take more than the law permits for use of money loaned is usury, and whether by such means more than the legal rate of interest has been contracted for is a question of fact, to be collected from the whole of the transaction as it passed between the parties."

As was said by the Kentucky Court of Appeals in Edrington v. Harper, 3 J. J. Marsh. 354, 20 Am. Dec. 145: "It is often very difficult to descriminate between mortgages and conditional sales. Every case must be determined by a consideration of its own peculiar circumstances, and it is proper that no specific rules should be defined for distinguishing mortgages from conditional sales: otherwise, the usurer, with the rules before him, would be able to evade the laws against usury, and oppress the necessitous with

impunity." And again on page 355 of 3 J. J. Marsh. (20 Am. Dec. 145): "The intention of the parties is the only true and infallible test. That is to be collected from the condition or conduct of the parties, as well as from the face of the written contract." And again: "The fact that the real transaction between the parties was a borrowing and lending will, whenever or however it shall appear, show that a deed, absolute on its face, was intended as a security for money; and whenever it can be ascertained to be a security for money it is only a mortgage, however artfully it may be disguised." To the same effect in substance is the ruling of the court in Baldwin v. Crow, 86 Ky. 679, 7 S. W. 146. And that such rules apply for the construction of the contracts in question cannot well be doubted.

To distinguish a sale from other transfers of property, it is said in' Cyc. vol. 35, page 27: "The essence of a sale is the transfer of the property in the thing from seller to buyer. The elements which distinguish a sale from other transfers are: (1) That the transfer is of the property; that is, of the general or absolute property, as distinguished from a special property; and (2) that it is for a price." And again, in the same volume, pages 39 and 40: "If, however, there is a right reserved by the buyer to demand and enforce repayment, the transaction is not a sale, but in the nature of a mortgage." And the author cites in the note the case of Robinson v. Farrelly, 16 Ala. 472, as holding: "When the vendee retains the right to demand repayment of the vendor; notwithstanding the purchase, it is conclusive to show that the transaction was intended as a security and not a sale."

In the light of the authorities cited, the intention of the parties is to govern, and that intention is to be ascertained from the contract and the conduct of the parties in the transactions thereunder. In the agreed statement of facts, and in the argument of counsel, it was agreed that all of the accounts involved in these transactions between the petitioner and the bankrupt corporations were accounts that were due in 120 days, and that the amount retained or collected thereon as interest (called in some places service charge) was at least at the rate of 24 per cent. per annum. In arriving at the proper construction of the contracts, the accounts will be considered of the 120-day class as set out in the first paragraph of the contracts, and the discounts or interest charges accordingly. Under the provisions of the contracts, and as the business was conducted by the parties up to February 2, 1912, when bankruptcy proceedings were commenced, the transactions were as follows:

The Chair Company, or the Reed Company, as it happened to be, styled in the contract the first party, being from time to time in need of money, on such occasions made out a list or inventory of accounts owing to it by its customers for goods sold and presented the same to the Home Bond Company, styled in the contract the second party. If the second party found the accounts acceptable to it, it then advanced or paid to the first party 75 per cent. of the face value of the accounts, and the accounts on the books of the latter were stamped as sold to the second party. The accounts were, under the terms of the contract and in *practice* by the parties, collected in the name of and by the first party in the regular course of its business, and the proceeds were by the first party turned over to its paid employé, who was mutually acceptable to the parties, and was the attorney in fact for both parties, and who at once transmitted the proceeds of the collection of the account to the second party. If the account was promptly paid in the 120 days, or when due, the second party at once took from the sum so remitted to it the 75 per cent. of the face of the account, which had been paid, or loaned, by it to the second party, and also the 5 per cent. discount from the face of the account, and the remainder of the proceeds of the collection it at once remitted back to the first party. However, the second party had the right to withhold such "remainder" to make good some other account in default or where a debtor for an account had become insolvent. But if the account was not promptly paid and accounted for as above stated, when due, then an additional discount or interest charge on the face value of the account for such overtime, according to the schedule of rates prescribed in the contract, was made by the second party and also deducted from "the remain-

der" belonging to the first party. And where the debtor of an account had become insolvent, or in the event of the nonpayment of any account at maturity, by the contract, the first party covenanted and obligated itself "to repurchase said account within five days after receipt of written notice thereof."

In all this we find wanting what have been defined to be the essential elements of a sale: (1) There was no transfer of the absolute property in the accounts. The accounts were to be, and were, so far as the transactions were carried out, collected by the first party, the alleged seller, and at its costs and expense. The absolute property in the accounts was not transferred, because the second party only acquired the right to have or take from the proceeds of the account the amount it had advanced thereon and its stipulated usurious interest, and the remainder of the proceeds represented an interest in the account which by the contract the first party had at all times retained, and was to go to it or for its benefit. The fact that the entire proceeds of the collection was to be and was remitted to the second party, and the remainder then remitted back to the first party, can in no sense alter or refute or disguise the fact that the latter at all times had to that extent a property right in the account. (2) No definite price was fixed as the purchase price, and again there was reserved by the alleged buyer the right to demand and enforce payment, not of the face of the account, but only repayment if the 75 per cent. advanced and the stipulated usurious interest, which from the authorities, supra, "is conclusive to show" that the transfer of the accounts was not a sale, but in the nature of a mortgage. On the other hand, we have as indicative of a loan a definite amount to be advanced on each account according to the time at which it became due, with the obligation for the repayment of that sum with interest at a rate four times the legal rate, and that regardless of whether the account is paid or not.

It is plain to be seen that the only money furnished, or which the second party was in any sense called upon or obligated to furnish, whether called a payment or a loan, on the accounts, was the 75 per cent., or $75 on the $100, of the face of the accounts, and that all the second party was entitled to receive back, whether from the collection of the account, or from its repurchase by the first party, was the $75 on the $100 of the face of the account, the only amount it had furnished, plus the discount or interest charge, which was at the rate of 20 per cent. per annum, or 3⅓ times the legal rate on the money so furnished, if the account was paid at maturity, and, according to the statement of agreed facts, amounting, in the actual transactions as had, to not less than 24 per cent. per annum, or four times the legal rate on said amount. There are very many terms and conditions in the contract to which no reference has been made, because their purpose seems only to be to provide guaranty and security to the second party of the performance by the first party of the contract, and serve in some degree only to disguise the real transaction.

In the light of the authorities above quoted, it is the opinion of the special master, quite evident, from the provisions of the contract and the conduct of the parties thereunder, and it is so by him held, that the contracts were not sales of the accounts involved by the respective bankrupt corporations to the petitioner, but transfers of the accounts as security. According to the agreed statement of facts, the Indiana statute, like the Kentucky statute, fixes 6 per cent. per annum as the legal rate of interest; and while the Indiana statute permits interest up to 8 per cent. to be contracted for in writing, it provides that, if over 8 per cent. be contracted for or collected, all over 6 per cent. is forfeited. And in both states such excess of interest may be relieved against, and, if paid, recouped. It is immaterial, therefore, whether the contracts in question were made in Indiana or Kentucky. Therefore, in the settlement of these transactions between the petitioner and the trustee of the bankrupt estates, the same should be purged of all usury; and the petitioner, the Home Bond Company, be treated in this proceeding as a creditor of the bankrupt corporations with security for its debt.

A claim is asserted by the petitioner for the sum of $140.34, being the ag-

gregate of certain items of court costs, expenses, attorney's fees, etc., expended by it to enforce the payment of some of the accounts collected by it. That such costs and expenditures were incurred and paid by the petitioner does not seem to be questioned in the response of the trustee; but for that officer it is simply contended that the costs were incurred and expenditures made by the petitioner after the appointment and qualification of the custodian on April 9, 1912, and that by reason of the filing of the petitions in bankruptcy, and the appointment and qualification of the custodian of the bankrupt estates, the right to collect said accounts passed to the custodian, and that thereafter the right of petitioner to make such expenditures ceased. Although the contract is silent as to when or under what circumstances the petitioner was authorized to incur such costs or liability, or in fact to make collection of any of the accounts, yet under the terms of the eighth clause in the contracts it seems to be conceded that petitioner could employ counsel or cause legal action to be instituted to enforce the payment of any of said accounts, or any part thereof, either in its own name, or in the name of the first party; and the clause certainly does provide that "in either case" immediate payment shall be made by the first party to the second party of "all court costs, expenses, and attorney's and stenographer's fees" which may be by the latter expended in such proceedings. It is not averred in the pleadings, nor is it made to appear in the agreed statement of facts, when petitioner incurred the costs, fees, and expenses for which this claim is made; but it seems that these liabilities were incurred by the petitioner in the effort to reduce to money the accounts, which, in the view taken by the special master, constituted a security to it for its claim against the bankrupt, and the special master is of opinion that under all the circumstances of this case this claim should be allowed to the petitioner.

The petitioner also sets up claim against the trustee for the sum of $800, being $100 per month from March 16 to October 12, 1912, inclusive, paid by it to E. Manning, who in the sixth clause of the contract was by the bankrupt appointed attorney in fact to receive remittances in payment of the accounts embraced in these transactions and transmit the same to the petitioner. The averment in the petition is that $100 per month was a reasonable charge, that under the provisions of said sixth clause of the contract the bankrupt was to pay him, but, failing to do so, the petitioner was compelled to make such payment. From the trustee's response and the agreed statement of facts it appears in substance that during the continuance of the contracts here involved between the petitioner and the New England Chair Company and the American Fibre Reed Company, respectively, said Manning was the treasurer of the New England Chair Company and its bookkeeper, and assistant secretary of the American Fibre Reed Company and its bookkeeper, and was in each of said contracts appointed by the company by whom he was employed the attorney in fact as stated; that for all his services while so employed by these companies, including such as he rendered as such attorney in fact, he was to receive a regular salary, and the same was paid to him by the Chair Company, until the business was taken over by the Reed Company, and then by it up to April 9, 1912, when the custodian took charge of the bankrupts' estates, with the exception of the two weeks just prior to April 9, 1912, and that two weeks' salary is owing him from the Reed Company; that from April 9, 1912, to September, 1912, said Manning was in the employ of the custodian as clerk, and likewise from September, 1912, until January, 1913, he was in the employ of the trustee as clerk, and his salary in such employments has been paid him out of the bankrupts' estates.

There is no averment in the petitioner's petition of what, if any, services as such an attorney in fact was rendered by said Manning, during the time from March 16, 1912, to November 12, 1912, or any part of it, nor can it well be seen how he could have rendered any service in that capacity, inasmuch as the record in this case shows that after his appointment the custodian and then the trustee has been receiving all collections of the accounts made, except such as have been collected by the petitioner, and it was impossible for said Manning to have received any such collections as such attorney in fact or made transmittance thereof to petitioner. In the opinion of the special

master, this claim of the petitioner should be and the same is disallowed, as is also the application of the petitioner for allowance of his attorney's fee in this proceeding.

The United States Supreme Court, in the case of Sexton v. Dryfus, 219 U. S. 343–345, 31 Sup. Ct. 256, 55 L. Ed. 244, announced the rule that the date of the filing of the petition is the date, in all cases, at which the affairs of the bankrupt are supposed to be wound up, and that the rule applies in the case of secured as well as unsecured creditors. Subsection "h" of section 57 of the Bankrupt Act provides: "The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors or by such creditors and the trustee, by agreement, arbitration, compromise or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance." Act July 1, 1898, c. 541, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443).

The antagonistic attitude of the parties as to their respective rights under the contracts involved has brought the subject into court, and the effort must be to adjust matters between them as near as may be to these requirements. Instead of stating the account between the parties as of February 2, 1912, the date of the filing of the petition in bankruptcy, the parties seem from the agreed statement of facts to have contemplated the date of the filing of such agreed statement, and to have included interest on some of the items to that time. No injustice can be seen in this, provided interest is computed on both sides of the account. Upon that idea the special master states this account between the Home Bond Company and the trustee, based upon the agreed statement of facts as follows:

According to the agreed statement of the facts the total amount of discount or interest charge retained by the Home Bond Company, on accounts of the New England Chair Company, collected through the attorney in fact, E. Manning, being at the rate of at least 24 per cent. per annum upon the 75 per cent. of the face of such accounts, advanced or paid on such accounts from the time of such advance or payment to the time of the collection of the account and remittance to the Home Bond Company:

| | | |
|---|---:|---:|
| Amount to.................................................... | $4,128 96 | |
| Only one fourth of such sum would be the legal interest........... | 1,032 24 | |
| Leaves as due trustee for usury in sum retained.................. | $3,096 72 | |
| Interest at 6 per cent. for one year on this sum.................. | 158 80 | |
| Agreed amount of the "reserve" from such accounts due the Chair Company and now in hands of Bond Company.................. | 978 64 | |
| Interest at 6 per cent. for one year on this sum.................... | 58 71 | |
| Total due by Bond Company on accounts of Chair Company....... | $4,292 87 | |
| By 75 per cent. of $2,845.88, Chair Company accounts collected by the trustee............................ | $2,134 41 | |
| By 6 per cent. interest thereon for one year............ | 128 06 | |
| By 75 per cent. of $2,364.35, Chair Company accounts uncollected ....................................... | 1,773 26 | |
| By 6 per cent. interest thereon for one year........... | 106 39 | 4,142 12 |
| Balance due by Bond Company to trustee on Chair Company account................................. | | $ 150 75 |

The amount of the discount or interest charge retained by the Home Bond Company on accounts of the American Fibre Reed Company, collected through the attorney in fact, E. Manning, being at the rate of at least 24 per cent. per annum upon the 75 per cent. of the face of such accounts advanced or paid on such accounts, from the time of such advance or payment to the time of the collection of the account and its remittance to the Bond Company:

Amounts to........................ . .... ........................ $ 679 35
Only one fourth thereof would be legal interest.. ................      169 83

Leaves due trustee for usury in sum retained.....................  $ 509 52
6 per cent. interest on same for seven months............. .......      17 85
Agreed amount of "reserve" due from accounts of Reed Company
   collected by Bond Company and now in its hands. ...............   1,265 38
6 per cent. interest on same for seven months .....................      . 44 31
                                                    $1,837 06

By 75 per cent. of $2,409.25, Reed Company accounts
   collected by trustee.......... ..................... $1,806 93
By 6 per cent. interest on same seven months.... .....      38 05
By 75 per cent. of $616.56, Reed Company accounts un-
   collected ................... ............... ..........      462 42
By 6 per cent. interest on same seven months...... . ...      16 17     2,323 57

Balance due from trustee to Bond Company, account Reed Com-
   pany accounts...... ........................................ $  486 51
Deduct amount due trustee from Bond Company on Chair Com-
   pany accounts..............................................      150 75

Leaves due Bond Company from trustee on both accounts........ $  335 76
To which add amount allowed Bond Company for court costs, at-
   torney's fees, etc............................................      140 34
                                                    $ 576 10

Duffin, Sapinsky & Duffin, of Louisville, Ky., for Home Bond Co.
Brown & Nuckols, of Frankfort, Ky., for the trustee.

COCHRAN, District Judge. These causes are before me on ex-ceptions filed by the Home Bond Company to the report of Referee Lindsey, as special master herein. The matter with which the report has to do is the relation of that company to certain accounts in favor of the bankrupts, some of which have been collected by the trustee herein, and some by the company. The latter claims to have been the owner of the accounts when collected under written contracts of purchase. This claim the trustee contests. Its position is that the company mere-ly had a lien thereon for certain loans made by it to the bankrupts and legal interest thereon from the dates of the respective loans. The spe-cial master has upheld this position, and stated the accounts between the bankrupts and the company on this basis. It is of this action that the company complains by its exceptions.

The contract between the bankrupt, the New England Chair Com-pany, and the company, is in words and figures as follows:

"This agreement, made this 6th day of March, 1911, at Indianapolis, Indi-ana, by and between New England Chair Company, hereinafter called first party, and the Home Bond Company, hereinafter called second party, wit-nesseth: That for one dollar ($1.00) and other good and valuable considera-tions, each to the other paid, receipt whereof is hereby acknowledged, the parties hereto have agreed and do hereby agree as follows:

"First. That said second party shall buy from said first party all accepta-ble accounts tendered to it by said first party and pay therefor the face value thereof less the following discounts: One per cent. on accounts that are paid within fifteen days. Two per cent. on accounts that are paid within thirty days. Three per cent. on accounts that are paid within sixty days. Four

per cent. on accounts that are paid within ninety days. Five per cent. on accounts that are paid within one hundred and twenty days. Six per cent. on accounts that are paid within one hundred and fifty days. Seven per cent. on accounts that are paid within one hundred and eighty days—subject, however, to the terms of this and any subsequent written agreement executed by the parties hereto.

"Second. That the said party shall pay: Seventy-eight per cent. on thirty day accounts. Seventy-seven per cent. on sixty day accounts. Seventy-six per cent. on ninety day accounts. Seventy-five per cent. on one hundred and twenty day accounts. Seventy-four per cent. on one hundred and fifty day accounts. Seventy-three per cent. on one hundred and eighty day accounts—upon delivery to and acceptance of such accounts duly assigned to the party of the second part, and the remainder, less discount and deductions taken by the debtor, shall be paid immediately after the collection of the account by the second party: Provided, however, no payment of the remainder shall be made while any of said accounts are in default.

"Third. The first party shall properly assign and deliver to said second party all accounts purchased, including the right of stoppage in transitu, either in the name of the party of the first part or in the name of the party of the second part (provided, however, the party of the second part shall not be charged with negligence in not making stoppage in transitu in any event unless thereunto requested by the party of the first part). If the merchandise named in the accounts should be refused or returned, for any cause, the title to such merchandise shall be and remain in said second party until such accounts are paid.

"Fourth. Said first party hereby guarantees the payment to the second party or its assigns of all accounts purchased hereunder according to the terms thereof. In the event of nonpayment at maturity to said second party of any accounts as purchased as aforesaid, or should the debtor become insolvent, said first party hereby covenants and agrees to repurchase said accounts within five days after receipt of written notice thereof and to pay therefor the same amount paid to the first party by said second party, plus the discount provided for in the first paragraph of this contract. Said second party is hereby given the right without notice to said first party to credit any moneys coming into its possession, belonging to said first party, on its accounts.

"Fifth. Immediately after the purchase of every account hereunder, said first party shall make upon its book an entry showing the absolute sale of said accounts to said second party, and said second party is hereby given the right and privilege of auditing the books, accounts, and records of said first party, relating to said accounts, at any time that it may see fit to do so.

"Sixth. Where as, it is for the mutual benefit of the parties hereto that the collection of said accounts shall in the first instance be remitted to the parties of the first part and in its name, the party of the first part shall at all times appoint some person or persons, mutually acceptable to both of the parties hereto, their attorney in fact to receive all such remittances in whatever form they may be made, and to transfer, assign, and transmit all such proceeds to said party of the second part. And said party of the first part shall, immediately upon receipt of such remittances, in whatever form the same shall be made, deliver the same to such attorney for transmittal to the party of the second part; and said attorney shall at all times have access to all mail received by said party of the first part, and all books and records of the party of the first part, to discover what payments and remittances are made upon such accounts. And in consideration of the execution of this agreement by the party of the second part, said party of the first part undertakes to guarantee the faithful conduct of said attorney in fact in the receipt, assignment, and transmittal of all such payments or remittances. And upon the like consideration said party of the first part shall pay unto said attorney in fact compensation for all such services so rendered in that behalf; and we will furnish and provide for said attorney in fact all necessary clerical or stenographic assistance for making reports and remittances.

Said attorney in fact shall also have the right and power, and it shall be his duty to endorse the name of the party of the first part on any freight or express bill or bill of lading relating to said accounts, and ratifying and confirming all its said attorney may do in the premises. And said attorney in fact as to all such matters shall receive such moneys or other remittances solely for the party of the second part and shall at all times be subject to its exclusive orders with relation thereto; and it is now mutually agreed between the parties hereto that E. Manning shall be and continue such attorney in fact to perform such duties, until by mutual agreement of the parties hereto another person shall be appointed in his stead.

"Seventh. That said second party in making purchase of accounts hereunder relies upon the guaranties and covenants of said first party herein contained and upon the written representations made to it by said first party as to the financial responsibility of said first party; that said written representations heretofore made and that may hereafter be made are for the purpose of establishing the credit of said first party so that sale of accounts may be made hereunder.

"Eighth. That said first party shall execute and deliver to said second party or its assigns any document necessary or proper to carry into effect this contract, and should second party employ counsel or cause legal action to be instituted to enforce payment of any of said contracts, or any part thereof, either in its own name or the name of the party of the first part, then and in either case said first party shall immediately pay to said second party or its assigns, all court costs, expenses, and attorney's and stenographer's fees which may be by it expended in such proceedings.

"In witness whereof, the said first party has hereunto set its hand and seal, and said second party has caused these presents to be executed by its president and secretary, and its corporate seal to be hereto attached.

"The New England Chair Company  [Seal.]<br>"By A. D. Martin, President.

"Attest: Chas. Irion, Secretary.

"Home Bond Company,<br>"By P. J. Hauss, Vice President.

"Attest: F. H. Rupert, Secretary.

"For and in consideration of the execution of the foregoing agreement by the Home Bond Company, the undersigned hereby guarantees to said Home Bond Company the full prompt and faithful payment and discharge by New England Chair Company of all and singular the agreements and provisions therein contained to be by said New England Chair Company kept, observed, and performed, and hereby waives notice of acceptance of this guarantee by the Home Bond Company.

"In witness whereof, we and each of us have hereunto set our hands and seals this 6th day of March, 1911.

A. D. Martin.        [Seal.]<br>"Graham Vreeland.    [Seal.]<br>"Chas. Irion.        [Seal.]

"Witness: Chas. Irion."

The contract between the other bankrupt and the company is of similar character and dated November 9, 1911. I approve of the conclusion reached by the special master and the reasoning on which it is based. The considerations which support this conclusion are that the bankrupts were to and did collect the accounts and bear all expense in connection with their collection; what is claimed to have been the purchase price for the accounts, to wit, the difference between the face of the accounts and the discount, was not known until payment of the account and receipt thereof by the company, and then depended on the time that had elapsed since the date of the advance of the 75 per cent.; what is claimed to have been deferred payment of the purchase price was simply a return to the bankrupt of the excess of the collection over

and above the advance and discount; and the provision that, in the event of nonpayment of any of the accounts at maturity or the debtor becoming insolvent, the bankrupt should repurchase the accounts and pay therefor the advance made thereon plus the discount.

The argument on behalf of the Bond Company assumes that the conclusion of the special master is based on the consideration that the bankrupt guaranteed the payment of the accounts, and is directed largely to combating the idea that this consideration rendered the transaction a loan and not a purchase. Numerous cases are cited where purchases of notes and accounts, accompanied by a guaranty of payment, have been held to be purchases, and not loans at usurious rates of interest. But I do not understand that the special master's conclusion is based on this consideration; nor is it needed to uphold it. Possibly, however, the fact that the contracts were accompanied by a personal guaranty that the bankrupts would make full, prompt, and faithful payment and discharge of all the agreements and provisions therein contained to be kept, observed, and performed by it is not without some significance in upholding that conclusion.

The decision of the Circuit Court of Appeals of the Second Circuit in the case of In re Canfield, 193 Fed. 934, 113 C. C. A. 562, and of the Supreme Court of the United States in the same case under the style of Houghton, Receiver, v. Burden, 228 U. S. 161, 33 Sup. Ct. 491, 57 L. Ed. ——, rendered April 7, 1913, is relied on by the company as conclusive on the question herein involved. But I fail to see its relevancy to this case. In that case there was no such question in issue as that in issue here. Burden did not claim to have purchased the accounts there involved. He simply claimed a lien thereon to secure a loan, and the sole question was whether the contract between him and the bankrupt was usurious, and therefore, under the law of New York, void. The ground upon which it was claimed to be usurious was the provision that, in addition to receiving 6 per cent. on his money, Burden was to receive a certain compensation for certain services to be rendered by him for the bankrupt. The question as to whether this provision rendered the contract usurious hung on whether it was a sham and device to cover usury, or really intended to provide compensation for the services called for in the contract.

Here, if the contracts are treated as evidencing loans, there can be no question that the discount provided for is usurious. It is for greatly more than the legal rate of interest. The discount provided for is not for services to be rendered by the company to the bankrupts. It was to render them no services. All that it did, or had a right to do, was on its own account. Hence the only way of saving the contracts here is to make good the contention that they evidence purchases, and not loans. That the company has failed to do. Rather, it has been shown that it is not good.

In so far as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest. That the company was not averse to the use of shams is otherwise apparent from the use by it of the word "service," in its dealings with the bankrupts under the contracts,

to characterize the discounts. In any view of the contracts, those discounts were not charges for services rendered the bankrupts. Loans are never regarded as services.

The report of the special master is approved and confirmed.