## In re GRAND UNION CO.

(Circuit Court of Appeals, Second Circuit. December 15, 1914. On Petition for Rehearing, January 22, 1915.)

No. 87.

**1. SALES ☞1—WHAT CONSTITUTES.**

A "sale" is a transfer of property in a thing for a price in money. The transfer of the property in the thing sold from buyer to seller for a price is the essence of the transaction, and the transfer is a transfer of the general or absolute property, as distinguished from a special property, in the thing.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1, 3–5; Dec. Dig. ☞1.

For other definitions, see Words and Phrases, First and Second Series, Sale.]

**2. WORDS AND PHRASES—"LOAN OF MONEY."**

A "loan of money" is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equal to that borrowed. In order to constitute a loan, there must be a contract whereby in substance one party transfers to the other a sum of money which the other agrees to repay absolutely, together with such additional sums as may be agreed on for its use, and if such be the intent of the parties the transaction will be a loan, regardless of its form.

**3. SALES ☞6—TRANSFER AS SECURITY—ASSIGNMENTS.**

A contract by which a bankrupt agreed to sell and petitioner agreed to buy certain piano leases for less than their face, the bankrupt to guarantee collection of payments thereunder, and to collect the same for petitioner's benefit, and to repurchase uncollected leases, or substitute others therefor, etc., was not an absolute sale of the leases, but a transfer as security for a loan.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 14; Dec. Dig. ☞6.]

**4. CORPORATIONS ☞461—ORGANIZATION—POWERS.**

Petitioner, an Illinois corporation, was organized under an act authorizing the formation of corporations for any lawful purpose, except banking, insurance, real estate, brokerage, the operation of railroads, and the business of loaning money, and petitioner's charter declared that the general object of the corporation was to do a general brokerage and commission business, and to buy property other than corporate stocks and real estate at judicial, fiduciary, trustees', pledgors', mortgagees', and other liquidating sales, and convert the property into money, but not to engage in the business of loaning money, and to have a place of business where promissory notes or other evidences of indebtedness might be made payable. *Held,* that a contract by which a corporation agreed to purchase certain piano leases, which was in fact a mere loan of money at a usurious rate of interest by the corporation to the bankrupt, was prohibited by the corporation's charter and by the statute, and was therefore void.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1814; Dec. Dig. ☞461.]

**5. CORPORATIONS ☞385—"ULTRA VIRES."**

While the phrase "ultra vires" has been used to designate, not only acts beyond the express and implied powers of a corporation, but also acts contrary to public policy or contrary to some express statute prohibiting them, the latter class of acts is now termed illegal, and the "ultra vires" confined to the former class.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1545–1547; Dec. Dig. ☞385.

For other definitions, see Words and Phrases, First and Second Series, Ultra Vires.]

6. CORPORATIONS ⬤═▷487—CONTRACTS—ILLEGALITY—RECOVERY OF PAYMENTS.
    Where a contract by a corporation for a loan of money to a bankrupt
    on security of assignments of installment piano leases was illegal and
    executory, the corporation could not recover thereunder money collected
    by the bankrupt or its representative on the leases assigned, and funds
    paid over to the corporation on such leases would be credited to the bank-
    rupt, not exceeding the sum actually advanced.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898;
    Dec. Dig. ⬤═▷487.]

Petition to Revise and Appeal from Order of the District Court of
the United States for the Southern District of New York.

This cause comes here on petition to revise and appeal from a final
order made and entered in the United States District Court for the
Southern District of New York on June 8, 1914, denying a motion
made by the Hamilton Investment Company for an order directing the
receiver and trustee of the Grand Union Company to account to it for
any and all moneys that he had collected or that had come into his
possession from the Grand Union Company out of certain leases and
for other relief.

The Grand Union Company is a corporation organized under the laws of the
state of New York, which maintained a place of business at No. 311 Third
avenue, borough of Manhattan, city of New York. It was engaged in the
business of selling pianos upon the installment plan and giving leases instead
of bills of sale to the purchasers; the purchasers agreeing to pay weekly or
monthly, as the case might be, for the pianos purchased. The Hamilton In-
vestment Company is a corporation organized under the laws of the state of
Illinois and having its principal office in Chicago in that state.

On January 20, 1912, the Grand Union Company and the Hamilton Invest-
ment Company entered into a contract with each other in which the former
agreed to "sell" and the latter agreed to "buy" from time to time piano leases.
Portions of the contract follow:

"First. First party hereby agrees to sell and second party agrees to buy
from time to time such of said contracts which shall draw 6 per cent. interest
per annum, and which second party shall indicate will be acceptable to it,
paying therefor 70 per cent. of the face value thereof, upon delivery duly
assigned and guaranteed and their acceptability duly indicated by second
party, and paying a further 20 per cent. of the face value of said contracts
as nearly as practicable in quarterly installments, but not to exceed 20 per
cent. of the amounts that shall from time to time be thereafter collected upon
said contracts until a total of 90 per cent. shall have been paid, as the full
purchase price of said contracts.

"When first party shall sell pursuant hereto contracts which shall have
been given by divers purchasers payable in installments, and any of which
shall not be promptly met, first party shall promptly repurchase any such con-
tracts so in arrears for cash at par for the balance uncollected thereon, or
substitute therefor other acceptable contracts of equal value and shall then
also pay cash for such portions as shall be then in default.

"Second. First party shall in every case execute an absolute assignment
and guaranty satisfactory in form to second party of all its right, title, and
interest in and to each of the contracts which upon delivery second party shall
control, and second party shall thereafter be alone entitled to receive all
moneys due and owing thereon and shall have sole and exclusive charge of
the collections of same.

"And whereas, the business of first party is such that it is deemed de-
sirable that the collections on the contracts shall be made at its own office
or place of business, it is therefore agreed that first party shall have the
right to designate some acceptable person to act as agent of second party to
receive all moneys in behalf of second party and to do such other work in con-

---

⬤═▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

nection therewith as the second party may desire. First party hereby guaranteeing and holding itself responsible for the acts of such agent and agreeing that it will see that such agent execute and give acceptable surety bond to protect the interests and rights of second party in the discharge of said acts and duties. By way of remuneration of such services second party hereby agrees to pay said agent the sum of twenty-five dollars per month and it is understood that second party shall at any time in the exercise of its own judgment have power to remove or dismiss from its employ any such agent and replace him by another.

 ✠  ✳  ✳  ✳  ✳  ✳  ✳  ✳  ✳  ✳

"Fourth. First party hereby guarantees the prompt payment of the principal and interest of all such contracts.

"Fifth. It is agreed and understood that in the event of nonpayment at maturity of any of the installments of principal or interest on any of said contracts by reason of the insolvency of the debtors or for any reason, then second party is hereby given the right and option without notice to apply any moneys in its hands or that may thereafter come into its possession, belonging to said first party in settlement and discharge of such installments so in default. * * *

"In the event of failure or refusal of any debtor to retain the merchandise after delivery to him, the title thereto shall revert to and remain in second party until the amount due on any such contracts is fully paid and discharged. * * *

In the event of the failure or refusal of the debtor indicated in any of said contracts for any reason whatsoever to pay the whole amount due upon any contract so purchased or to be purchased by it hereunder, and if first party shall have failed to repurchase the same within the time herein provided, then second party is hereby authorized if it sees fit to institute such legal proceedings as in its judgment or of its attorneys may be necessary or proper to enforce the payment of any such contract. First party expressly agrees to pay and reimburse second party for all costs, expenses, including attorney's and stenographer's fees, which may be incurred thereby."

On January 2, 1913, an involuntary petition in bankruptcy was filed against the Grand Union Company in the District Court for the Southern District of New York and a receiver and trustee were successively appointed in such proceeding. Thereafter, because of the interference by the receiver with the collection by the Hamilton Investment Company of the installments due and payable on the piano leases purchased from the Grand Union Company, the Hamilton Investment Company made application to the District Court for an order permitting it to proceed with the collection of the balances due on all of the leases purchased by it from the bankrupt, and restraining the receiver from in any manner attempting to collect any of the installments maturing under the leases, and directing him to account for any and all moneys that he had collected, or that had come into his possession from the bankrupt arising out of any or all of said leases. It was alleged that prior to the filing of the petition in bankruptcy the Grand Union Company collected on the leases certain moneys amounting approximately to $2,898.33, which under the contract belonged to the Hamilton Investment Company, and which had not been turned over to it. It was also alleged that the receiver had collected or was about to collect all amounts due under the leases assigned and that he intended to include the same in the general fund and assets of the bankrupt estate. The Hamilton Investment Company claims to be the true and lawful owner of the leases assigned to it under the contract.

The trustee opposing the application of the Hamilton Investment Company claims that the contract is not a contract for the sale and purchase of leases, but one providing for loans with the leases as security; that such a contract of loan is contrary to the charter of the petitioner and the statutes of Illinois and is ultra vires and void; that it is contrary to the Banking Law of the state of New York; that the relation between the petitioner and the bankrupt is that of debtor and creditor; that the relief sought should be denied and judgment entered ordering the delivery to the trustee of all the leases assigned by the bankrupt to the petitioner.

Henry J. & Charles Aaron, of Chicago, Ill., for appellant.

Myers & Goldsmith, of New York City (Henry A. Heiser, of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The court below denied the petitioner's application because in its opinion the contract was in reality not a contract for the purchase and sale of piano leases as it purported on its face to be, but was one providing for loans with the leases as security. The court was also of the opinion that such a contract of loan was contrary to the charter of the petitioner and the existing statutes of the state of Illinois and was ultra vires and void. It also adjudged the contract to be in violation of the Banking Law of the state of New York, and it held that the transactions between the bankrupt and the petitioner created a relation of debtor and creditor. Judgment was accordingly entered ordering the delivery to the trustee of all the piano leases assigned by the bankrupt to the petitioner, and the petitioner was ordered to account to the trustee for moneys which it had collected on the leases subsequent to the receivership. It was also ordered that all moneys received under the contract by the petitioner prior to the filing of the involuntary petition in bankruptcy should be credited by it to an amount not exceeding the sum actually paid and advanced by it to the bankrupt upon leases in reduction of the indebtedness for moneys paid by it to the bankrupt.

We have to determine in the first place, therefore, whether error was committed in holding that the contract into which these parties entered was one of loan and not of sale. The kind of business the petitioner is engaged in has grown within the past few years to large proportions. There are a number of concerns in different parts of the United States which are engaged in the same kind of transactions. The question involved is new and the case may almost be said to be one of first impression.

[1] A sale is the transfer of property in a thing for a price in money. The transfer of the property in a thing sold from a buyer to a seller for a price is the essence of the transaction. And the transfer is a transfer of the general or absolute property as distinguished from a special property.

[2] A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

"In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form." 39 Cyc. 926.

[3] The contract these parties entered into was on its face an agreement on the part of the Grand Union Company "to sell" and on the part of the Hamilton Investment Company "to buy" piano leases. In the transfer of the leases under this contract the Grand Union Com-

pany issued what it stamped "Bill of Sale," in which it set forth in detail the leases, the names of the lessees, the amounts due, and the amounts paid, and declared that it "hereby sells, assigns, and transfers to Hamilton Investment Company" "all right, title, and interest in and to the contracts, leases, and mortgages above named," and "that entries have been made on our books disclosing the absolute sale thereof to the Hamilton Investment Company." The parties appear to have thought, or to have wanted the public to think, if we accept the language they used at its face value, that they were engaged in buying and selling leases. But was that the real nature of the transaction in which they engaged?

As the contract provides in terms for a "sale," we agree that, before we can hold the transaction involved a loan and not a sale, the fact should clearly appear that it was in reality a loan and not a sale. It may be conceded that the evidence to prove a transaction to be different from what it appears to be from the written papers, as to show an absolute deed to be a mortgage, or a transaction fair on its face to be usurious or otherwise illegal, must be clear and convincing. In determining, however, the meaning of the contract which these corporations made and the nature of the transactions into which they entered, it will not be difficult to find out what it was they intended, if we examine the agreement in its entirety and closely examine its various provisions. It is not necessary to go outside of the writing, as is done when a deed absolute on its fact is shown to be a mortgage, to discover the true character of the transaction. The parties have expressed their intention in the written agreement. We arrive at their intention, not from any detached part of the instrument, but from an examination of the whole of the writing. If in the written contract the parties call a transaction in which they have engaged a "sale," we are to assume ordinarily that they have used the term correctly and in its technical sense. But if the contract goes on to set out in detail the facts of the transaction and the statement thus made clearly discloses that what the parties called a sale was in reality not a sale, but a loan or a bailment or a mortgage, the court must decide according to the real nature of the transaction, without regard to the term the parties applied to it. It is necessary in contracts of this nature to scrutinize them closely for the purpose of ascertaining the real import and the real intention of the parties.

A case, in some particulars resembling the case now under consideration, came before the District Court of the United States for the Eastern District of Kentucky in 1913. In re American Fibre Reed Co., 206 Fed. 309. That case, like this one, arose in bankruptcy upon an intervening petition filed by a corporation which claimed to have purchased certain accounts owing to the bankrupt corporation. The trustee in that case, as in this, had proceeded to collect certain of the accounts, which the intervening petitioner alleged had been purchased from the corporations prior to their bankruptcy, and was retaining them in his possession, claiming them as a part of the estates of the bankrupts, on the ground that the transactions between the parties did not amount to a buying of the accounts, but were in substance and

effect nothing more or less than a pledging of the accounts by the corporations to the intervening petitioner for a loan in each instance of a certain per cent. of the face value of the accounts and at a usurious rate of interest. In that case, as in this, the corporations "sold" the accounts to the petitioner, and the accounts were collected by the vendors at their expense, the proceeds to be applied first to the payment of the amount advanced by the vendee to the vendors, and the remainder of the amounts collected went to the vendors for their own benefit. The amount paid by the vendee was about 75 per cent. of the face value of the account, and accounts so "sold" were stamped on the books of the vendors as "sold" to the intervening petitioner. The accounts, having been collected by the vendors, were turned over to their paid employé, a person mutually acceptable to both parties, and he at once transmitted the same to the vendee. If accounts were not paid when they matured and the debtors were insolvent, the vendors were bound to repurchase the accounts within five days of written notice of default. In all this there is a close resemblance to the transactions involved in the present suit. The court refused to recognize the right of the vendee, the intervening petitioner. "In so far," said the court, "as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest."

It remains, however, to point out an important difference in the facts of that case and the facts in this case. In that case there was no sale, because the absolute property in the accounts was not transferred to the so-called vendee. It was not transferred, because the "vendee" or purchaser only acquired the right to have or to take from the proceeds of the accounts the amount it had advanced thereon and its stipulated usurious interest, and the remainder of the proceeds represented an interest in the accounts which vendors had at all times retained and which was to go to them or for their benefit. To that extent the vendees had retained a property right in the accounts sold, and the court held that this prevented there being an absolute sale, and it construed the transaction to have been a loan at a usurious rate. But in the case at bar the proceeds belonged to the vendee and the vendors retained no right in any part thereof. The case was affirmed in Home Bond Co. v. McChesney, 210 Fed. 893, 127 C. C. A. 552 (1914); the court calling attention to the fact that the record disclosed a mutual intendment that the right at least to 20 per cent. of the full value of each of the accounts receivable was always to remain in the bankrupts, except only for purposes of security, and adding: "This right could not be both sold and owned by the bankrupts."

A second case, which in some particulars also resembles the one now under consideration, came before the United States District Court for the Northern District of Illinois in June of this year. Chase & Baker Co. v. National Trust & Credit Co., 215 Fed. 633. In that case, as in this, a corporation agreed to "buy" from another all acceptable accounts, and the vendor was to act as the vendee's agent, without compensation or cost, to collect and receive in trust for the vendee the amounts paid in on such accounts. But the sums so paid were not

to be commingled with the funds of the vendor, and were to be at once transmitted in the form in which they were received to the vendee. The vendor guaranteed payment and agreed to repurchase at face value all accounts in default. The vendee agreed to pay the face value of the accounts less certain discounts, the amount of which depended on the length of time the accounts ran. These ran from 1 per cent. on 15-day accounts to 7 per cent. on 18-day accounts. The vendee further agreed to pay 78 per cent. on 30-day accounts, and from that down to 73 per cent. on 180-day accounts. In this case the vendor and guarantor of the accounts filed a bill in equity to rescind the transactions and recover back the accounts or the proceeds thereof on repayment of the purchase price, with legal interest, on the ground that the transactions were ultra vires. The basis for the charge of ultra vires was that such sales, viewed from the standpoint of the purchaser, were discounts; that discounting was a banking function; that defendant, although empowered to purchase accounts, could not lawfully engage in the business of purchasing accounts, because that was a banking business, and corporations could not be organized under the general incorporation act of Illinois to do a banking business.

It was claimed that the vendor or seller of the accounts was entitled to an accounting on the ground that the apparent sales were in fact only devices or subterfuges to conceal loans and that such loans were usurious. Circuit Judge Mack held that a court of equity would not be frustrated in ascertaining the real intention of the parties to make a usurious loan by the fact that parol proof thereof would contradict the written evidence of the apparent transaction, and that if in fact both parties intended a usurious loan, then, in so far as the transactions were still executory, the debtor might recover his collateral on payment of the debt, with legal interest. But as the bill in his opinion fell short of making any clear charges that both parties actually contemplated and made loans disguised as sales with guaranties, and merely gave plaintiffs' conclusion of law that the transactions amounted to loans, he declined to dismiss the bill, but gave leave to amend it, so as properly to charge, if plaintiffs were so advised, that the transactions were in fact usurious loans.

We have stated somewhat fully these two cases, because they deal with contracts much resembling the contract involved in the present suit, and also because they are the only cases, so far as we are aware, in which the courts have passed on this class of contracts. While the documents in those cases were not identical with each other, and the documents in neither are identical with those in the case at bar, so that the exact questions in this case were not in those, yet the decisions rendered shed light on the matters to be decided in the pending case.

Stripped of the verbiage with which the parties have sought to clothe their transactions, the naked facts disclose that what they were doing was not a sale, but a loan, and that the leases were turned over simply by way of security. The Grand Union Company needed money, and the Hamilton Company advanced it. The method as set forth in the opinion of the special master was as follows:

"The conduct of the parties in the transactions under the contract of January 20, 1912, was as follows: The rates at which the unpaid balances on the leases are claimed to have been purchased by the Hamilton Investment Company were based on the maturity of the contracts, the following discounts being charged: Six per cent. on contracts maturing in 12 months; 7 per cent. on those maturing in from 12 to 16 months; 8 per cent. on those maturing in from 16 to 20 months; 9 per cent. on contracts maturing in from 20 to 24 months; and 10 per cent. on those maturing in from 24 to 30 months. A further deduction of 20 per cent. was made from the total unpaid balances of the leases purchased, and the amount placed on the books of the petitioner to the credit of what was known as the 20 per cent. reserve account, to be remitted in quarter-annual payments of 20 per cent. of amounts collected and remitted under the leases, provided no leases were in default, in which case the amount of such default was to be deducted from the 20 per cent. reserve. A payment of from 70 to 74 cents on the dollar on the unpaid balance due on each lease was made to the Grand Union Company at the time such lease was assigned and delivered to the petitioner, except where the lease did not mature within 30 months of the date of such transfer. Where the lease exceeded 30 months, the Grand Union Company received from the petitioner only 70 per cent. of such portion of the unpaid balance as would mature within 30 months; the remaining 30 per cent. being represented by the petitioner's discount of 10 per cent. and the amount credited to the 20 per cent. reserve account. The balance of the unpaid installments under the lease which would mature beyond 30 months was placed on the books of the petitioner in what was known as the special reserve account. The petitioner claims to have purchased in its entirety each lease having more than 30 months to run, but that settlement for the installments that would mature beyond 30 months was withheld until the leases had paid off to a point where they would have but 30 months to run. Mr. Rees, president of the Hamilton Investment Company, referring to one of the leases in question which had more than 30 months to run, testified, however, as follows: 'Our method has been this: If an account ran 60 months, as in that case, we would make a settlement for the first 30 months maturing at the time of purchase, and *perhaps* in 12 months we would purchase 12 months additional of that contract. I mean we would make settlement for it. Our object, you understand, is to purchase only paper that matures in 30 months.'"

The money thus advanced was repaid by the Grand Union Company in the following manner: It collected at its own expense all installments of rent as they became due under the leases, put all such moneys into its general funds, and out of such general funds remitted the aggregate amount of its collections to the Hamilton Investment Company at Chicago; and on all sums due under the leases it was paying interest to the Hamilton Investment Company at the rate of 6 per cent. per annum, although the leases themselves bore no interest. It is true that the contract stated that the moneys due on the leases should be collected by one Lesser, who was an agent of the Hamilton Investment Company, and who was to remit to it at Chicago, for which he was to receive a salary of $25 per month. But this device cannot prevent the real nature of the transaction from being disclosed. Lesser is admitted to have been during this whole time the manager of the Grand Union Company, and his salary was paid by it, and he received not one cent from the Hamilton Investment Company. Moreover, Lesser put whatever money he received on the leases, as has been said, into the general funds of the Grand Union Company. We have, then, money advanced to be repaid in installments; the time for payment being determined by the periods fixed in the respective leases for the payment of moneys due on such leases, the contract also provid

ing for the payment of interest, and payment actually made by the Grand Union Company out of its general funds.

The Hamilton Investment Company claims that under the contract the absolute title passed to it for a price in money, and that therefore the transaction was a sale. We cannot concur in this view. The leases passed to it, to be sure; but it took them by way of security, and not as an absolute owner. On the payment of these leases they were returned to the Grand Union Company. The Hamilton Investment Company wrote the Grand Union Company:

"We do not make any indorsement of any sort on the leases, so that when they are paid out you will receive them back from us in the same condition in which we had received them from you."

And if default was made in the payment of any of the leases they were returned to the Grand Union Company, which either paid them itself or substituted other leases in their place. The president of the petitioner was asked:

"Where you purchase a paper [piano lease] under which the purchaser of the piano agrees to make monthly payments, and it appears that you can't collect from that purchaser the amount that you paid initially, the initial payment would then go back to the Grand Union Company, and they either must make a payment to you or substitute some other paper; that is, the loss, if any, under that contract, must be sustained by the Grand Union Company, and not your company?"

And he replied "Yes." The fact that the bankrupt guaranteed payment of principal and interest on all leases "purchased" by the petitioner does not, standing alone, convert the transaction from a sale into a loan. It is, however, a circumstance which we can take into consideration in arriving at the true intent of the parties. If the transaction was in reality a sale, it would seem as though the vendor's duty was at an end when the title passed, and that thereafter there would have been no obligation to guarantee payment or to make the collections. It "sold" at a discount accounts that were good, and made itself responsible for every conceivable loss. If the contract was one of sale, it is strange that after the vendor had sold its right, title, and interest it should have agreed to collect the money due under the leases at its own expense, making itself liable for the acts of the collecting agent, and putting the money it received into its general funds. The purchaser of the leases never looked to the persons obligated by the leases for the money due it; but it looked to the vendor, and to it only. If the lessee failed to pay the vendor, then the vendor repurchased the lease from the vendee for cash at par for the balance due on the defaulted contract.

We observe, also, that when these leases were transferred to the Hamilton Investment Company the latter gave no notice to the debtors of the fact of assignment, although upon the assignment and sale of a chose in action it is almost invariably the case that the assignee gives such notice. These piano leases did not provide for the payment of interest on the installments as they became due, and yet under the contract between the Grand Union Company and the Hamilton Investment Company the latter paid the former from 90 per cent. to 94

per cent. of the face value of the leases, and the Grand Union Company was required to pay the Hamilton Investment Company 6 per cent. per annum on the face of the leases which the latter concern took over. In paying from 90 per cent. to 94 per cent. of the face value of the leases, the Hamilton Investment Company was deducting from 6 per cent. to 10 per cent. interest in advance; that is, it was taking discount. Discount is taking out of the principal sum and the retention by the lender of the interest charged for the use of the principal. That it was discount is made plain, too, by the fact that the Grand Union Company also paid interest monthly at the rate of 6 per cent. per annum. It is rather a surprising proposition we are asked to accept, when we are told that these transactions are sales, and not loans. If the Hamilton Investment Company bought these leases, why does the Grand Union Company pay it interest on them? When a horse or a suit of clothes is sold, whoever heard of an agreement on the part of the seller to pay interest to the buyer on the value of the horse during its life or on the value of the suit of clothes so long as it is worn?

Another important circumstance that indicates that the transaction was not a sale is found in that provision in the contract in which it is agreed that, in event of the failure or refusal of any debtor under a piano lease to retain the merchandise after delivery to him, the title should revert to and remain in the Hamilton Investment Company "until the amount due in any such contract is fully paid and discharged." If the Hamilton Investment Company really purchased the piano leases outright, and took absolute title as purchaser, there would have been no necessity for any such provision as that title should revert to it "until the amount due on any such contract is fully paid and discharged." The amount due on the contract means the amount which the Hamilton Investment Company loaned to the Grand Union Company on that particular lease.

[4] The Hamilton Investment Company is, as we have seen, an Illinois corporation. The Illinois Corporation Act provides, in section 1, chapter 2:

"That corporations may be formed in the manner provided for in this act for any lawful purpose except banking, insurance, real estate, brokerage, the operation of railroads and the business of loaning moneys," etc.

The charter of the corporation, originally the Ft. Dearborn Trust Company, the name being afterwards changed to the Hamilton Investment Company, defines its object as follows:

"2. The object for which this corporation is formed is to do a general brokerage and commission business, and to buy property other than corporate stocks and real estate at judicial, fiduciary, trustees', pledgors', mortgagees', and other liquidating sales, and convert the property so bought into money, but not to engage in the business of loaning money, and to have a place of business where promissory notes or other evidences of indebtedness may be made payable."

It thus appears that it is by its charter prohibited from "engaging in the business of loaning money." There is no principle of law better settled than that a corporation cannot enter into a contract which is expressly prohibited by its charter or by statute. A contract so

made is absolutely void. No performance on either side can give it any validity. Jackson, etc., Railway v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515 (1896); Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55 (1891).

[5] But we are told that the defense of ultra vires cannot be raised in this collateral proceeding. The phrase "ultra vires" unfortunately has been used to designate, not only acts beyond the express and implied powers of the corporation, but also acts which are contrary to public policy or contrary to some statute expressly prohibiting them. The latter class of acts are now termed "illegal," and the term "ultra vires" is confined to the former class. "Ultra vires contracts are contracts which are beyond the statutory powers of the corporation, and not contracts expressly prohibited by statute and contrary to the public policy of the Legislature." Cook on Corporations (7th Ed.) vol. 3, p. 2161, note. We do not need to consider when the defense of ultra vires may or may not be interposed. The objection here is, not that the contract is ultra vires, but that it is illegal. While a corporation is held in some states to be estopped from setting up the defense of ultra vires by having received the benefits of the contract, the courts so holding do not apply that principle to cases in which the contract is absolutely void. National Home Building, etc., Co. v. Home Savings Bank, 181 Ill. 35, 54 N. E. 619, 64 L. R. A. 399, 72 Am. St. Rep. 245; 10 Cyc. 1161, 1162.

[6] The law is well settled that property or money parted with on the faith of an illegal contract can be recovered back. In Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 488, 39 L. Ed. 55 (1891), the Supreme Court, speaking through Mr. Justice Gray, said:

"A contract ultra vires being unlawful and void, not because it is in itself unmoral, but because the corporation, by the law of its creation, is incapable of making it, the courts. while refusing to maintain any action upon the unlawful contract. have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it."

So Lord Justice Mellish, in the English Court of Appeals, in Taylor v. Bowers, 1 Q. B. D. 291, 299 (1876), said:

"If money is paid or goods delivered for an illegal purpose, the person who had so paid the money or delivered the goods may recover them back before the illegal purpose is carried out; but if he waits till the illegal purpose is carried out, or if he seeks to enforce the illegal transaction, in neither can he maintain an action. The law will not allow that to be done."

The rule is stated in 2 Comyn on Contracts, 361, as follows:

"Where money has been paid on illegal contract, it is a general rule that if the contract be executed, and both parties are in pari delicto, neither of them can recover from the other the money so paid; but if the contract continues executory, and the party paying the money be desirous of rescinding it, he may do so and recover back by action of indebitatus assumpsit for money had and received. And this distinction is taken in the books, that where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, clearly such an action can in no case be maintained; but where the action proceeds in

disaffirmance of such a contract, and instead of endeavoring to enforce it presumes it to be void, and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, then it is consonant to the spirit and policy of the law that the plaintiff should recover."

The contract of January 20, 1912, is an executory contract, not having been fully performed, and the trustee is therefore entitled to have transferred to himself all leases assigned to the Hamilton Investment Company by the bankrupt Grand Union Company and all moneys collected by the Hamilton Investment Company subsequent to the filing of the involuntary petition in bankruptcy. As to the moneys received by the Hamilton Investment Company prior to the filing of the involuntary petition, it was proper that that company should be credited with such moneys, not exceeding the sum actually paid and advanced by it to the bankrupt upon leases in reduction of the indebtedness for moneys paid by it to the bankrupt.

We do not find it necessary to consider the other questions raised in this case. We have found no error, and are satisfied that the prayer of the petitioner should be denied, and that the order of the court below should be affirmed.

It is so ordered.

### On Petition for Rehearing.

A petition for rehearing is presented and must be denied. The decree denied the relief which the Hamilton Investment Company sought and in addition granted affirmative relief to the trustee. Because such affirmative relief was granted the rehearing is asked.

The petitioner alleges in his petition that "the only pleading filed in his case by the trustee is his answer," and that the answer is purely defensive and does not ask for affirmative relief. The general rule has been as well established as any in the law that to entitle a defendant in equity to affirmative relief he should file a cross-bill, which had to be regularly served, put in issue and heard as any original bill. Rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi) of the new equity rules promulgated by the Supreme Court in November, 1912, obviates the necessity of filing a cross-bill, and affirmative relief may be asked now in the answer.

The petitioner, in making this application for a rehearing on the ground above stated, apparently has lost sight of the nature of the proceedings in the court below. This was not a regular suit based upon a bill of complaint and an answer. There was no bill of complaint and no answer. The present petitioner had obtained an order requiring the receiver to show cause why he should not be restrained from collecting any installments under the piano leases which had been transferred to it, and to account for any money he had collected. An affidavit was made by the attorney of the receiver to the effect that the Hamilton Investment Company was not authorized to do business in the state of New York. Judge Mayer granted the motion to show cause, provided the Hamilton Company gave a bond conditioned that it would pay to the trustee anything that it had collected under the piano leases if its claim was overruled, and thereupon referred the whole matter to Mr. Mason as special master. The master reported

that the transactions of the Hamilton Investment Company were ultra vires and that the contract with the bankrupt had no legal effect for that reason. In this situation the trustee was entitled to affirmative relief, to wit, an accounting, and the order to surrender the leases was incidental to it.