**United States Bankruptcy Appellate Panel**
**FOR THE EIGHTH CIRCUIT**

No. 97-6097EM

In re:  LeeAnna Johnson,                          *
                                                 *
          Debtor.                    *
                                                 *
                                                 *
LeeAnna Johnson,                          *
                                                 *     Appeal from the United
States
          Appellant,                          *      Bankruptcy Court
for the
                                                 *   Eastern District of
Missouri
      v.                                     *
                                                 *
Missouri Baptist College,                          *
                                                 *
          Appellee.                          *

Submitted: February 18, 1998
Filed: March 26, 1998

Before KOGER, Chief Judge, KRESSEL and DREHER, Bankruptcy
Judges.

KRESSEL, Bankruptcy Judge.

    The appellant, LeeAnna Johnson, appeals from a judgment of
the bankruptcy court[1]

---

[1]The Honorable Barry S. Schermer, United States Bankruptcy Judge for the Eastern
District of Missouri.

1

determining her debt to the appellee, Missouri Baptist College, to be nondischargeable under 11 U.S.C. § 523(a)(8).  We affirm.

## BACKGROUND

Johnson is a former student at Missouri Baptist College. In the fall of 1989, the College extended credit to Johnson in the amount of $5,892.49 for tuition, books and other expenses. On August 28, 1989, the debtor executed a promissory note in this amount, with the balance due on December 15, 1989. Johnson defaulted on the note and filed her Chapter 13 bankruptcy petition on November 1, 1996.

On June 6, 1997, the College filed a complaint to determine the dischargeability of Johnson's debt.[2]  By an order dated December 3, 1997, and entered on December 8, 1997, the bankruptcy court determined that Johnson's debt to the College was a nondischargeable student loan under 11 U.S.C. § 523(a)(8).  Johnson appeals.  Since we agree with the bankruptcy court that Johnson's debt to the College is a loan as that word is used in 11 U.S.C. § 523(a)(8), we affirm.

## DISCUSSION

On appeal, Johnson argues that the bankruptcy court erred when it concluded that her debt to the College qualified as a student loan under 11 U.S.C. § 523(a)(8).  In particular, Johnson alleges that the College's extension of credit cannot constitute a loan for § 523(a)(8) purposes because she never received money from the College.  We review the bankruptcy court's legal conclusions *de novo*.  First Nat'l Bank of Olathe

---

[2]At the time of its complaint, the outstanding principal balance on the note was $4,915.96. Pursuant to the provisions of the promissory note, the College added $737.40 in attorney's fees and $1,524.00 in accrued interest to its debt.

v. Pontow, 111 F.3d 604, 609 (8th Cir. 1997); Chamberlain v. Kula (In re Kula), 213 B.R. 729, 735 (B.A.P. 8th Cir. 1997).

3

11 U.S.C. § 523(a)(8) excepts from discharge a debt "for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend. . . ." Since the parties stipulate that the College is a non-profit institution and that the credit was extended for educational purposes under a program, the only issue presently on appeal is whether the College's extension of credit was a loan.

## History of 11 U.S.C. § 523(a)(8)

### The Debate

The student loan exception to discharge has a fairly short, but interesting, history. Congress first established the Guaranteed Student Loan Program under the auspices of the Higher Education Act of 1965. Designed to meet "[t]he challenge of keeping the college door open to all students of ability. . . .", the Program guaranteed federally-backed, low-interest loans to qualifying students. S. Rep. No. 89-673 (1965), *reprinted in* 1965 U.S.C.C.A.N. 4027, 4055.

Reports of students discharging their educational obligations first emerged in the early 70's. Neither the Bankruptcy Act nor the provisions governing the student loan programs specifically prohibited the discharge of student loans.[3] Stories proliferated of students discharging their educational obligations on the eve of lucrative careers.

---

[3]Section 430 of the Act provided: "Upon default by the student borrower on any loan covered by Federal loan insurance . . . the insurance beneficiary shall promptly notify the Commissioner, and the Commissioner shall . . . pay to the beneficiary the amount of the loss sustained by the insured. . . ." Higher Education Act of 1965, Pub. L. No. 89-329, § 430(a), 79 Stat. 1219, 1260 (1965).

4

Notwithstanding the isolated and inflammatory nature of these incidents, the popular portrayal of the "deadbeat" student debtor proved both compelling and enduring.[4]

---

[4]The legislative record is replete with incendiary accounts of "solvent" students filing bankruptcy to discharge their educational obligations. Robert P. Zeigler, Executive Director, Oklahoma State Regents for Higher Education, provided the following account of a psychology student who declared bankruptcy in order to discharge $4,100 in student loans:

> The girl (sic) graduated from a state university in March, 1972 and she owed $4,100 (principal) on four loans. She subsequently married, the son of a "wealthy" New York businessman and petitioned for bankruptcy on August 9, 1973 under her married name. . . . She went to work and prior to her petition, had enough money in a second bank to pay off her student loans. She used the entire sum to make a downpayment on a house in her husband's name, and then she blew the student loan debt which constituted her only debt. In August, 1973 she informed the original bank that she had no intention of repaying the loans. . . . Then, she hit the second bank in July, 1975 for a $1,400 student loan for graduate study before we could close the circuit. . . . She also received G.I. Benefits and can safely look out the window of her house and thumb her nose at the U.S. Congress and the taxpayers, as she reads the latest profound thoughts about psychology.

Letter from Robert P. Zeigler, Executive Director, Oklahoma State Regents for Higher Education to Hon. Edwin D. Eshleman (October 16, 1975).

Tales of professional students discharging their educational obligations through bankruptcy provoked special public attention and animus. One story repeatedly referred to in the legislative history involved a lawyer who, along with his wife, sought to discharge some $18,000 in joint student loans upon graduating. At the time of their filing, the husband was employed with a legal aid bureau and his wife was a state employee. The parties' filing and discharge headlined local papers and occasioned much criticism, including the withdrawal of contributions to the legal aid bureau. The husband was subsequently indicted for bankruptcy fraud.

Letter from Student Loan Guarantee Foundation of Arkansas to M. Adams (October 15, 1975).

In 1970, Congress created the Commission on the Bankruptcy Laws of the United States to propose changes to then-existing bankruptcy laws. Among other items on its agenda, the Commission addressed the treatment of educational loans under the Bankruptcy Act. In 1973, recognizing the "threat to the continuance of educational loan programs," the Commission issued a report recommending limitations on the dischargeability of student loans. Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pts. 1 & 11 (1973). The Commission's proposal prohibited any discharge of educational obligations during the first five years of repayment unless the debtor demonstrated hardship: "The Commission . . . recommends that, in the absence of

hardship, educational loans be nondischargeable unless the first payment falls due more than five years prior to the petition." Id.

Educational Amendments of 1976

Three years later, Congress visited the dischargeability issue. Congressional testimony emphasized the role of federal funding in facilitating postsecondary education:

> The Committee recognizes the massive contribution to financing postsecondary educational opportunity made in the ten years of operation of the GSLP. No other program of the Federal Government has been as successful in expanding financial resources to support educational expenses of our citizens. As roughly one in every fifty American citizens has benefited from this program, its massive success in serving its purposes should not be diminished. However, such high levels of participation and the need to expand educational opportunity have created both program growth and opportunity for abuse which have threatened to destroy this fine record of success.

S. Rep. No. 94-882, at 19 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4713, 4731.

Unlike the house and Commission proposals which incorporated a hardship provision for students seeking to discharge their educational obligations inside the five-year period, the Senate advocated absolute nondischargeability during the first five years of repayment:

> The Committee bill seeks to eliminate the defense of bankruptcy for a five-year period, to avoid the situation where a student, upon graduation, files for a discharge of his loan obligation in bankruptcy, then enters upon his working career free of the debt he rightfully owes. After a five-year period, an

7

> individual who has been faithfully repaying his loan may really become bankrupt.  He should not be denied this right. . . .

S. Rep. No. 94-882, at 32 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4713, 4744.

The Senate eventually receded from its position and Congress adopted the Commission's recommendations in section 439A of the Education Amendments of 1976.  Section 439A (a) provided that:

A debt which is a loan insured or guaranteed under the authority of this part may be released by a discharge in bankruptcy under the Bankruptcy Act only if such discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of commencement of the repayment period of such loan, except that prior to the expiration of that five-year period, such loan may be released only if the court in which the proceeding is pending determines that payment from future income or other wealth will impose an undue hardship on the debtor or his dependents.

Education Amendments of 1976, Pub. L. No. 94-482, § 439A(a), 90 Stat. 2081, 2141 (codified at 20 U.S.C. § 1087-3 (1976) (repealed 1978)).

## Bankruptcy Reform Act of 1978

Congress was again called upon to address the dischargeability of student loans when it passed the Bankruptcy Reform Act of 1978. The Act fostered considerable debate and even produced a bicameral split. Although the original Senate bill codified the Commission's recommendation limiting the dischargeability of student loans, the House bill advocated dischargeability. In endorsing the equal treatment of student loans, the House noted the exaggerated and anecdotal evidence on which the Commission's original proposal was based:

The rate of educational loans discharged in bankruptcy has risen dramatically in recent years. However, the rise appears not to be disproportionate to the rise in the amount of loans becoming due or to the default rate generally on educational loans. The rise has been slightly higher than the rise in the bankruptcy rate overall. The sentiment for an exception to discharge for educational [loans] does not derive solely from the increase in the number of bankruptcies. Instead, a few serious abuses of the bankruptcy laws by debtors with large amounts of

9

educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and before any loans became due, have generated the movement for an exception to discharge.

H.R. Rep. No. 95-595, at 133 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6094.

Notwithstanding the controversy, Congress adopted the Senate bill, enacting Public Law 95-598 and creating a new Title 11 of the United States Code. Under the new provision, debtors were not discharged from any debt:

   (8) to a governmental unit, or a nonprofit institution of higher education, for an   educational loan, unless--
      (A) such loan first became due before five years before the date of the filing         of the petition; or
      (B) excepting such debt from discharge . . . will impose an undue hardship on          the debtor and the debtor's dependents. . . .

11 U.S.C. § 523(a)(8) (1978).


### 1979 Stop-Gap

The repeal of § 439A and its replacement by 11 U.S.C. § 523(a)(8) created a gap in the student loan exception to discharge. Although § 439A was repealed on November 6, 1978, 11U.S.C. § 523(a)(8) did not take effect until October 1, 1979, creating nearly an eleven-month period during which student loans were, at least in theory, dischargeable. On August 14, 1979, Congress enacted Public Law 96-56 to fill the gap. Public Law 96-56 effectively resurrected 439A by amending § 17a of the Bankruptcy Act and applying its provisions "to any proceeding commenced under the Bankruptcy Act during the period beginning on the date of enactment of this Act and ending October 1, 1979." Act of Aug. 14, 1979, Pub. L. No. 96-56, 93 Stat. 387. As amended, § 17a provided an exception to discharge for:

   a loan insured or guaranteed under the authority of part B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1071 et seq.) unless (a) the discharge is granted after the five-year period (exclusive of any applicable suspension of the repayment period) beginning on the date of

11

commencement of the repayment period of such loan, or (b) the discharge is granted prior to the expiration of such five-year period and the court determines that payment from future income or wealth will impose an undue hardship on the bankrupt or his dependents.

11 U.S.C. § 35(a)(9) (repealed Oct. 1, 1979).  The committee report accompanying the bill  emphasized Congress' continuing commitment to impose limitations on the dischargeability of student loans:

> Section 1 of the bill closes the inadvertent "gap" created when the applicable section of the Higher Education Act of 1965 prohibiting discharge of student loans was repealed as of November 6, 1978, and its replacement section in title 11 was not made effective until October 1, 1979.  Congress obviously did not mean to create a gap and at all times held to the principle of nondischargeability of student loans as was found in section 439A of the Higher Education Act of 1965.

S. Rep. No. 96-230, at 3 (1979), *reprinted in* 1979 U.S.C.C.A.N. 936, 938.

### **Amendments to 11 U.S.C. § 523(a)(8)**

In the years following its enactment, amendments to 11 U.S.C. § 523(a)(8) have clearly reflected a congressional design to further limit the dischargeability of educational obligations.

### 1979 Amendment

In addition to closing the gap created by the early repeal of § 439A, in 1979 Congress also expanded the types of loans protected from dischargeability under 11 U.S.C. § 523(a)(8). Pub. L. No. 96-56, § 3(1) (1979).  In particular, the new amendment corrected the different treatment of profit-making and nonprofit institutions of higher education under § 523(a)(8):

> Because new 11 U.S.C. 523(a)(8) applies only to debts for educational loans owing to a governmental unit or to a nonprofit institution

13

of higher education, it has a very uneven effect upon the student loan programs administered by the Department of Health, Education, and Welfare. For example, National Direct Student Loan (NDSL) funds are administered by both nonprofit and profit-making institutions of higher education. Under the new law, a student who obtained an NDSL loan from a profit-making institution of higher education would be free to have that loan discharged in bankruptcy. In contrast, a

student who obtained an NDSL loan from a nonprofit institution of higher education would be subject to the prohibitions contained in the new law.

S. Rep. No. 96-230, at 1-2 (1979), *reprinted in* 1979 U.S.C.C.A.N. 936, 936-37.

Furthermore, the 1979 amendment excluded deferment periods from calculation of the repayment period. Pub. L. No. 96-56, § 3(2) (1979). Congress enacted the amendment primarily to prohibit debtors from deferring payments for the nondischargeability period:

> Loan programs typically provide periods of deferment during which a borrower's obligation to repay his loan is suspended. Using the Guaranteed Student Loan Program as an example, a student may defer repayment for an unlimited time if the student resumes study, for up to three years if the student serves in the Armed Forces, the Peace Corps or VISTA, and for up to one year if the student is unemployed. Therefore, it is possible for the first five years of the repayment period on a student's loan to run without the student having an actual repayment obligation during all of that period.

S. Rep. No. 96-230, at 3 (1979), *reprinted in* 1979 U.S.C.C.A.N. 936, 938.

### 1984 Amendments

In 1984, Congress again expanded the scope of 11 U.S.C. § 523(a)(8) by deleting language limiting dischargeability protections to loans issued by nonprofit institutions *of higher education*. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 454 (a)(2), 98 Stat. 375.[5]

---

[5]"Section 523(a) of title 11 of the United States Code is amended--
(2) by striking out 'of higher education' in paragraph 8." Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 454(a)(2), 98 Stat. 375-76.

<u>1990 Amendments</u>

In 1990, Congress expanded the period of repayment from five to seven years.  Federal Debt Collection Procedures Act of 1990, Pub. L. No. 101-647, § 3621(2), 104 Stat.

4933.[6]  Finally, the Student Loan Default Prevention Initiative Act of 1990 applied § 523(a)(8) to Chapter 13 cases.[7]

## The Debate Continues

In 1994, Congress again created a commission to review bankruptcy laws.  In its October 20, 1997 report, the National Bankruptcy Review Commission recommended to Congress that the exception to discharge for student loans be eliminated:

> The Commission recommends that Congress eliminate section 523(a)(8) so that most student loans are treated like all other unsecured debts.  In so doing, the dischargeability provisions would be consistent with federal policy to encourage educational endeavors.  The Recommendation would also address the numerous application problems that have resulted from the current nondischargeability provision.  No longer would Chapter 13 debtors who made diligent efforts to repay be penalized after completing a plan with thousands and thousands in compounded back due interest.  Litigation over "undue hardship" would be eliminated, so that the discharge of student loans no longer would be denied to those who need it most.

Report of the National Bankruptcy Review Commission, § 1.4.5 (October 20, 1997).

---

[6]"Section 523(a)(8) of title 11, United States Code, is amended--
 (2) by amending subparagraph (A) to read as follows:
> '(A) such loan, benefit, scholarship, or stipend overpayment first became due more than *7 years* (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition. . . ."

Federal Debt Collection Procedures Act of 1990, Pub. L. No. 101-647, § 3621, 104 Stat. 4964-65 (emphasis added).

[7]"Section 1328(a)(2) of title 11, United States Code, is amended by striking 'section 523(a)(5)' and inserting 'paragraph (5) *or (8) of section 523(a)*.'" Student Loan Default Prevention Initiative Act of 1990, Pub. L. No. 101-508, § 3007(b), 104 Stat. 1388-28 (emphasis added).

## Judicial Interpretations of the Word "Loan"

One of the most oft-cited definitions of "loan" can be found in the Second Circuit's opinion in In re Grand Union Co., 219 F. 353 (2d Cir. 1914). In In re Grand Union Co., the Second Circuit defined a loan as:

> [A] contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows. 'In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form.'

Id. at 356 (citing 39 Cyc. 296).

A number of courts, invoking the Second Circuit's "sum of money" language, hold that a loan does not arise unless and until there is an actual advance of *money* to the debtor. For example, in DePasquale v. Boston Univ. Sch. of Dentistry (In re DePasquale), 211 B.R. 439 (Bankr. D. Mass. 1997), Boston University allowed the debtor to attend classes without prepaying her tuition bill. When the debtor filed bankruptcy, the university sought to have the balance determined nondischargeable under 11 U.S.C. § 523(a)(8). The court concluded that the university's acquiescence in the debtor's continued attendance without prepayment did not satisfy the definition of a loan since no money had changed hands: "A loan involves more than an extension of credit. It is the furnishing of money or other property by a lender to a borrower." Id. at 441.

Likewise, in <u>New Mexico Inst. of Mining & Tech. v. Coole</u> <u>(In re Coole)</u>, 202 B.R. 518 (Bankr. D.N.M. 1996), the court concluded that a loan for § 523(a)(8) purposes had not arisen when the debtor merely incurred expenses on his student account:  "The plain meaning of 'loan' is that a sum of money must change hands."  <u>Id.</u> at 519; <u>see also</u> <u>Dakota Wesleyan Univ.</u> <u>v. Nelson</u> <u>(In re Nelson)</u>, 188 B.R. 32, 33 (D.S.D. 1995) (holding that charges for

"tuition, room and board, and other services" incurred by student debtor on an open account "cannot be categorized as an 'educational benefit overpayment' or as a 'loan.'").

Some of these cases seem to turn on the absence of a written agreement executed contemporaneously with the extension of credit.  See DePasquale, 211 B.R. at 442 (distinguishing Merchant v. Andrews Univ. (In re Merchant), 958 F.2d 738 (6th Cir. 1992), where "the debtor had signed forms evidencing the amount of her indebtedness *before* she registered for classes, much like one signs a promissory note before receiving an advance of funds.") (emphasis added); In re Nelson, 188 B.R. at 33 ("[T]he University's choice to allow [the debtor] to continue to attend classes without *signing a note* or making payment cannot amount to a loan. . . .") (emphasis added); Seton Hall Univ. v. Van Ess (In re Van Ess), 186 B.R. 375, 377 (Bankr. D.N.J. 1994) ("Nor does it appear that the Debtor and [the university] entered into any *written agreement* which provided terms for the payment of the . . . tuition.") (emphasis added).

Many courts have rejected the more formulaic definition of the word "loan" in favor of a flexible construct which emphasizes the substance of the transaction and the underlying intent of the parties.  In United States Dep't of Health and Human Servs. v. Avila (In re Avila), 53 B.R. 933 (Bankr. W.D.N.Y. 1985), the court adopted the following definition of "loan":

> Repeatedly, it has been observed that a loan may exist regardless of the form of a transaction.  Loans have been found to exist in transactions that were arguably purchases, and in transactions that were arguably transfers in trust.  Loans have been found, for the purpose of usury laws, when a bank advances money and the transaction is 'in substance' a loan.

20

>Loans, in substance, have been found when the issue is relevant to whether a corporation's actions have been ultra vires, and when the issue is relevant to the duty of fair dealing of one who receives money.

Id. at 936 (citations omitted).

The circuit courts which have addressed the issue have also adopted a broad definition of the word "loan."  For example, in United States Dep't of Health and Human Servs. v.

Smith, 807 F.2d 122 (8th Cir. 1986), the Eighth Circuit held that funds received pursuant to the Physician Shortage Area Scholarship Program satisfied the statutory definition of a loan. In Smith, the debtor sought to discharge benefits received under the Program, which required him to practice in physician shortage areas after graduation. Students who failed to fulfill their practice obligations were required to repay the funds. Notwithstanding their conditional nature, the Eighth Circuit held that the scholarships were loans: "We follow the weight of authority that '[a] loan is no less a loan because its repayment is made contingent.'" Id. at 125 (quoting Island Petroleum Co. v. Commissioner of Internal Revenue, 57 F.2d 992, 994 (4th Cir. 1932)).

In Andrews Univ. v. Merchant (In re Merchant), 958 F.2d 738 (6th Cir. 1992), the Sixth Circuit ruled that a university's extensions of credit constituted a loan for § 523(a)(8) purposes. In reaching its conclusion, the court observed that the debtor had executed a promissory note prior to matriculation: "In this case [the debtor] signed forms evidencing the amount of her indebtedness before she registered for class. She received her education from the University by agreeing to pay these sums of money owed for educational expenses after graduation. The credit extensions were loans for educational expenses." Id. at 741.

A number of courts have concluded that even short-term, unmemorialized extensions of credit constitute loans for § 523(a)(8) purposes. See Najafi v. Cabrini College (In re Najafi), 154 B.R. 185 (Bankr. E.D. Pa. 1993) (holding that student who was allowed to register and attend classes without prepaying tuition received a nondischargeable loan); University of New Hampshire v. Hill (In re Hill), 44 B.R. 645 (Bankr. D. Mass. 1984) (holding that university's provision of short-term

22

credit to student awaiting receipt of loan proceeds constituted a loan under 11 U.S.C. § 523(a)(8)).

In deciding whether a particular transaction qualifies as a loan, courts also consider the intent of the parties.  <u>See</u> <u>In re Merchant</u>, 958 F.2d at 740 ("If such be the intent of the parties, the transaction will be considered a loan without regard to its form.") (<u>quoting</u> <u>In re Grand Union Co.</u>, 219 F. at 356); <u>In re Hill</u>, 44 B.R. at 647 (noting that it was the debtor's "intention to pay the University the proceeds of his Higher Education Loan when received."); <u>In re Avila</u>, 53 B.R. at 937 (noting that the "intent of both parties was to create an obligation

which would require repayment."); <u>Midland Ins. Co. v. Friedgood</u>, 577 F.Supp. 1407, 1413 (S.D.N.Y. 1984) ("[A] critical issue in the determination of whether a transaction was a loan is whether the *intent* to make a loan was present.").

## Dictionary Definitions of "loan"

In the absence of a statutory ambiguity, courts are required to apply the plain meaning of the term at issue. <u>See NLRB v. Amax Coal Co.</u>, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under . . . common law, a court must infer, unless the statute otherwise dictates, that Congress meant to incorporate the established meaning of these terms."). Most of the courts that require an actual advance of money rely on dictionary definitions which define loans exclusively in these terms. However, our review of a number of sources (admittedly not exhaustive) has turned up a number of definitions which easily encompass Johnson's debt to the College.

Black's Law Dictionary defines a "loan" as "[a]nything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use." Black's Law Dictionary 936 (6th ed. 1990). Webster's Third International Dictionary defines a loan similarly, as "[s]omething lent for the borrower's temporary use on condition that it or its equivalent be returned." Webster's Third New International Dictionary 1326 (Philip Babcock Gove ed., 1993).

Although the definitions imply *money* as the subject of the loan transaction, they do not necessarily anticipate or even require an actual exchange of funds between the lender and the borrower. Notably, Black's Law Dictionary also defines a loan

24

as "[t]he creation of debt by the lender's payment of or agreement to pay money to the debtor or *to a third party* for the account of the debtor. . . ." Black's Law Dictionary 936 (6th ed. 1990) (emphasis added). The definitions do not require an exchange of funds at all. <u>See</u> <u>id.</u> ("'Loan' includes . . . [t]he creation of debt by *a credit to an account with the lender* upon which the debtor is entitled to draw immediately. . . .") (emphasis added); <u>see</u> <u>also</u> West's Legal Thesaurus/Dictionary 464 (William P. Statsky ed., 1986) (including among its definitions of loan an "advance, credit, accommodation [or] allowance. . . .").

Applying these definitions to the facts before us, we conclude that the arrangement between Johnson and the College constitutes a loan. Johnson's promise to remit the cost of tuition to the College in exchange for the opportunity to attend classes created a debtor/creditor relationship. She signed a promissory note to evidence her debt. By allowing Johnson to attend classes without prepayment, the College was, in effect, "advancing" funds or credits to Johnson's student account. Johnson drew upon these advances through immediate class attendance. It is immaterial that no money actually changed hands.

## Summary

We conclude that the debtor's definition controverts the history and purpose behind the student loan programs. From their inception in 1965, the federal student loan programs sought to ensure educational opportunity regardless of economic status. Recognizing that the continued vitality of the programs depended on the repayment of outstanding loans and to avoid potential abuse, Congress created an exception to discharge for educational obligations--obligations for which debtors would not even have qualified absent the federal

26

guarantee.[8]    In the two decades that followed, Congress has further restricted the

---

[8]One justification for the nondischargeability of student loans focuses on the special status of student borrowers.  Since they lack the normal indicia of creditworthiness--income and collateral--most students would not even qualify for a loan.  "[E]ducational loans are different from most loans.  They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education."  H.R. Rep. No. 95-595, at 133 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6094.

At least one commentator has argued for limitations on the dischargeability of student loans because students, unlike other debtors, retain the subject matter of the loan transaction in the form of an income-generating degree:

> The concept of bankruptcy is to give those who aren't able to meet their obligations an opportunity to throw both their assets and liabilities into a legal proceeding wherein their creditors liquidate the bankrupt's assets and share in the distribution of the revenues in proportion to the unpaid credit extended to the bankrupt.  The bankrupt is intended to come out "whole" but not with the assets.  In the case of student borrowers, the asset acquired by the credit extended is a college degree, a license to practice, increased learning, a capacity to perform specific tasks and often a more socially adjusted individual.  When the bankrupt walks away with these assets, how can there be a true bankruptcy?

Letter from Kenneth R. Reeher, Commonwealth of Pennsylvania Higher Education Assistance Agency to Hon. Don Edwards (January 28, 1976).

dischargeability of student loans through a series of legislative expansions. Amendments have expanded the types of institutions which qualify for § 523(a)(8) protection, lengthened the repayment period from five to seven years and applied dischargeability limitations to Chapter 13 cases.

Finally, we note that the debtor's definition of "loan" overlooks the realities of most commercial transactions in which money, in its most concrete manifestation, never actually changes hands. Under the debtor's definition, only the most mechanical transactions will constitute a loan. Therefore, it is in keeping with the words of the statute, Congressional intent and commercial reality that we treat the transaction between Johnson and the College as a loan.

## CONCLUSION

We conclude that the College's extension of credit to Johnson was a loan for purposes of 11 U.S.C. § 523(a)(8). Therefore, we affirm the decision of the bankruptcy court declaring Johnson's debt to the College to be nondischargeable.

A true copy.

    Attest:

        CLERK, U.S. BANKRUPTCY APPELLATE PANEL FOR THE EIGHTH CIRCUIT.