In re: Kevin RENSHAW, Debtor.

Cazenovia College, Plaintiff–Appellant,

v.

Kevin Renshaw, Defendant–Appellee.

In Re: David W. Regner, Debtor.

The College of Saint Rose,
Plaintiff–Appellant,

v.

David W. Regner, Defendant–Appellee.

Nos. 99–5018, 99–5019.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 1999

Decided July 24, 2000

David D. MacKnight, Rochester, New York (Stephen M. O'Neill, Lacy, Katzen, Ryen & Mittleman, LLP, Rochester, New York, of counsel), for Plaintiff–Appellant Cazenovia College.

Robert H. Lawler, DeWitt, New York, for Defendant–Appellee Kevin Renshaw.

Rudolph J. Meola, Albany, New York (Richard J. Miller & Associates, P.C., Albany, New York, of counsel), for Plaintiff–Appellant The College of Saint Rose.

Daniel J. Gallagher, Glens Falls, New York (Newell & Toomey, Glens Falls, New York, of counsel), for Defendant–Appellee David W. Regner.

Before: OAKES, CARDAMONE, and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

Cazenovia College and the College of St. Rose appeal respectively from an order of the United States Bankruptcy Appellate Panel for the Second Circuit that affirmed the dismissal of Cazenovia College's complaint against Kevin Renshaw, and from the judgment of the United States District Court for the Northern District of New York affirming the grant of summary judgment in favor of David W. Regner.

Kevin Renshaw and David W. Regner (debtors, students or defendants) both were college students, the former attending Cazenovia College, the latter the College of St. Rose. Each failed to pay college tuition when due, yet both were nevertheless allowed to attend classes thereafter. Both students subsequently declared bankruptcy. In each case, the college intervened in the bankruptcy proceedings to object to the debtors obtaining a discharge of the debts the colleges claimed the students owed them. The colleges contend that by permitting the students to attend classes they had extended to them educational loans exempt from discharge in bankruptcy. Cazenovia College also asserts that Renshaw's class attendance was an "educational benefit," also exempt from discharge.

Thus, these two appeals, argued together, concern the scope of 11 U.S.C. § 523(a)(8) (1994) that excepts from discharge in bankruptcy certain educational obligations. While similar disputes have often been resolved in bankruptcy courts, these are issues of first impression in this Circuit.

The meaning of the term "educational loan" used in the statute lies at the heart of these appeals. Although the word "loan" is not defined in § 523(a)(8), under the common law it means generally speaking a contract whereby one party transfers to another money or its equivalent that the latter agrees to repay later. While various contracts were entered into in these cases between the debtors and the colleges, none of those casual covenants meets the definition of loan. We hold therefore that such contracts do not constitute either educational loans or educational benefits within the meaning of § 523(a)(8).

In resolving these two appeals, we set out the background of each separately. But, inasmuch as we are affirming in each case and the issues raised in both cases are essentially the same, much of the discussion that follows encompasses both appeals.

## BACKGROUND

### I Cazenovia College v. Renshaw

Cazenovia College is a small, nonprofit, undergraduate college located in the bucolic village of Cazenovia, New York. On February 8, 1992 defendant Kevin Renshaw

signed and returned to Cazenovia a "Reservation Agreement" (Agreement) the college had previously executed. The Agreement obligated Cazenovia to hold a place open for Renshaw, provided he paid the amounts billed when due, and not to charge him more for tuition than the amount that was in effect on the applicable registration date. The Agreement further required Renshaw to pay a $285 reservation fee when he returned it, to pay tuition, room, and board for the 1992 summer session and 1992–93 academic year, and to be bound by various payment-related provisions set out on the back of the Agreement and in the college catalog. These provisions included an obligation to pay a "service charge" with an effective annual rate of 19.2 percent if payments on the student's account were not made by their due dates. Tuition for the fall 1992 semester was due by September 1, 1992, and tuition for the spring 1993 semester was due by January 1, 1993. All incoming students at Cazenovia signed identical agreements.

Although Renshaw failed to pay Cazenovia's charges when due, the college nonetheless allowed him to register, live in college housing, eat his meals there and attend classes for the 1992 summer and fall sessions. For personal reasons, Renshaw did not return to college for the spring 1993 semester. He did not notify Cazenovia of his withdrawal.

On March 17, 1993 Renshaw still owed Cazenovia $5,027.16, a sum that included several monthly service charges. The college sued and obtained a default judgment against him on December 4, 1996 in the amount of $9,999.87, including $3,169.99 in accrued service charges from July 1993, plus an award of attorneys' fees of $1,339.18. Two months later, on February 25, 1997, Renshaw filed for bankruptcy under Chapter 7 of the Bankruptcy Code. On May 8, 1997 Cazenovia initiated an adversary proceeding in the debtor's bankruptcy proceeding, seeking a determination that his obligation to Cazenovia was non-dischargeable under 11 U.S.C. § 523(a)(8).

On March 9, 1998 the Bankruptcy Court for the Northern District of New York (Gerling, C.B.J.) entered judgment denying Cazenovia College's motion for summary judgment and dismissing its complaint. *In re Renshaw*, No. 97–60985 (Bankr.N.D.N.Y. Mar. 9, 1998). The Bankruptcy Appellate Panel for the Second Circuit (Ninfo, Bucki, Gallet, B.JJ.) affirmed the bankruptcy court's judgment on February 5, 1999. *In re Renshaw*, 229 B.R. 552 (2d Cir. BAP 1999).

II *The College of Saint Rose v. Regner*

The College of Saint Rose (St. Rose) is a small, nonprofit four-year college located in Albany, New York. David W. Regner began attending St. Rose in the fall of 1991. Regner regularly paid his tuition through financial aid, until he enrolled for the fall 1993 semester. St. Rose permitted him to attend that semester without fully prepaying its $4,721.00 tuition fee. When St. Rose realized that Regner had failed to process necessary financial aid paperwork, it sent him a letter dated April 20, 1994 asking him to contact the college's Business Office about his "past due balance." Regner acknowledged his obligation to the college and made some payments, but did not pay his tuition bill in full.

On November 10, 1994 Regner stipulated in state court that he owed St. Rose $4,445.32 in tuition costs, not including interest. The college ultimately obtained a default judgment against him for $5,133.06. On March 13, 1997 Regner filed for bankruptcy under Chapter 7, and on May 5, 1997 St. Rose began an adversary proceeding in the bankruptcy court seeking a declaratory judgment that Regner's debt was nondischargeable. Both parties stipulated that the "arrangement was pursuant to a 'program' within the meaning of 11 U.S.C. § 523(a)(8)." *In re Regner*, No. 97–11645, slip op. at 2 (Bankr.N.D.N.Y. June 10, 1998).

The Bankruptcy Court for the Northern District of New York (Littlefield, B.J.) granted summary judgment in favor of Regner on June 10, 1998. *See id.* at 7–8. The District Court for the Northern District of New York (McAvoy, C.J.) affirmed this disposition in a judgment entered February 4, 1999. *College of Saint Rose v. Regner,* 229 B.R. 270 (N.D.N.Y.1999).

## DISCUSSION

### I Purpose of 11 U.S.C. § 523(a)(8)

For nearly 100 years it has been the primary purpose of the old Bankruptcy Act and now the new Bankruptcy Code to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh," *Williams v. U.S. Fidelity & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915), by providing the debtor "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preëxisting debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Yet, there are circumstances where giving a debtor a fresh start in life is not the paramount concern and protection of the creditor becomes more important. For that reason, Congress in the Bankruptcy Code created several exceptions to the general rule that debts may be discharged in bankruptcy. For example, none of the following are dischargeable: a debt incurred for a tax or customs duty, for property obtained by the debtor's fraud, a debt for child support or alimony, or a debt incurred for unpaid educational loans. *See* 11 U.S.C. § 523(a)(1), (2)(A), (5), (8) (1994 & Supp. III 1998). These exceptions to discharge, which further a variety of social policies, are narrowly construed. *See In re Hayes,* 183 F.3d 162, 167 (2d Cir.1999). Because bankruptcy is both a right of the debtor, and a remedy for the creditor, *see, e.g., In re Hayes,* 183 F.3d 162, 166 (2d Cir.1999); *Matter of Marchiando,* 13 F.3d 1111, 1115 (7th Cir. 1994), a proper balancing of those competing interests requires the creditor to prove by a preponderance of the evidence that its claim is one that is not dischargeable. *See Grogan v. Garner,* 498 U.S. 279, 287, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The issue that we must resolve in these appeals is whether the two debtors' obligations fall within the § 523(a)(8) exception to discharge for certain forms of educational debt. Section 523(a)(8) provides in relevant part that

> (a) a discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . . .
>
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend....

11 U.S.C. § 523(a)(8) (1994).

The underlying facts in these cases are undisputed. In *Renshaw,* the bankruptcy court dismissed Cazenovia's complaint and the bankruptcy appellate panel affirmed. We review the bankruptcy court's legal conclusions *de novo. See In re Bennett Funding Group, Inc.,* 146 F.3d 136, 138 (2d Cir.1998). In *Regner* the district court affirmed the bankruptcy court's grant of summary judgment based on stipulated facts. Here, too, we exercise plenary review over the district court's decision, which means that we independently review the bankruptcy court's legal conclusions *de novo. See In re Nextwave Personal Communications, Inc.,* 200 F.3d 43, 50 (2d Cir.1999); *In re Blackwood Assocs., L.P.,* 153 F.3d 61, 67 (2d Cir.1998).

### A. Legislative History

While the details of § 523(a)(8) have evolved over time, the problem it addresses remains the same: because student

loans are generally unsecured and recent graduates often have few or no assets, these debtors have an incentive to try to discharge their educational loans in bankruptcy. If successful, they can then enjoy the higher earning power the loans have made possible without the financial burden that repayment entails. Congress enacted § 523(a)(8) because there was evidence of an increasing abuse of the bankruptcy process that threatened the viability of educational loan programs and harm to future students as well as taxpayers. Congress recognized that this is an instance where a creditor's interest in receiving full payment of the debt outweighs the debtor's interest in a fresh start. *See Report of the Commission on the Bankruptcy Laws of the United States*, H.R. Doc. No. 93–137, pt. I at 11, 170, 176–77; pt. II § 4–506(8) & note (1973), *reprinted in* B *Collier on Bankruptcy*, app. pt. 4(c) at 4–253, 4–422, 4–431 to 4–432; 4–706, 4–710 to 4–711 (Lawrence P. King ed., 15th ed. rev.1996); *see also T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 936–37 (1st Cir.1995); *In re Pelkowski*, 990 F.2d 737, 742–43 (3d Cir.1993); *In re Merchant*, 958 F.2d 738, 741 (6th Cir.1992); *In re Van Ess*, 186 B.R. 375, 378–79 (Bankr.D.N.J.1994). The bankruptcy appellate panel of the Eighth Circuit has reviewed the legislative history of § 523(a)(8) in great detail. *See In re Johnson*, 218 B.R. 449, 451–54 (8th Cir. BAP 1998). We summarize briefly those parts relevant to the cases before us.

The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (1978), created Title 11 and implemented major reforms to the bankruptcy system. These included revision of the list of exceptions to discharge and enactment of § 523(a)(8). Section 523(a)(8) addressed the same abuse as an earlier, repealed provision of the education Code. *See* Education Amendments of 1976, Pub.L. No. 94–482, § 127(a), Education Act of 1965 § 439A(a), 90 Stat. 2081, 2141 (1976) (codified at 20 U.S.C. § 1087–3) (repealed 1978); S.Rep. No. 95–989, at 79 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865 ("[p]aragraph (8)

follows generally current law"). The new section paralleled that of the repealed provision, which was intended to avoid the situation where a graduating student would file for discharge of student loans in bankruptcy and then enter the workplace free from the debt rightfully owed. *See* S.Rep. No. 94–882, at 32 (1976), *reprinted in* 1976 U.S.C.C.A.N. 4713, 4744 (discussing Education Amendments of 1976). As initially enacted, it read

§ 523. Exceptions to discharge

(a) a discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(8) to a governmental unit, or a nonprofit institution of higher education, for an educational loan, unless—

(A) such loan first became due before five years before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents....

Bankruptcy Reform Act of 1978 § 523(a)(8), 92 Stat. at 2590–91.

Congress has amended § 523(a)(8) a number of times. In 1979, to avoid disparities in the treatment of loans from different sources (*i.e.*, for-profit as opposed to non-profit lenders) with respect to their dischargeability in bankruptcy, it broadened the subsection to cover "any educational loan made, insured, or guaranteed by a governmental unit, or made under any program ... funded by a governmental unit or nonprofit institution of higher learning." Bankruptcy Act—Student Loan Debts, Pub.L. No. 96–56, § 3(1), 93 Stat. 387 (1979); S.Rep. No. 96–230, at 1–2 (1979), *reprinted in* 1979 U.S.C.C.A.N. 936, 936–37. In 1984, Congress expanded the exception to apply to loans made under a program funded by *any* nonprofit insti-

tution and made stylistic changes to the section. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 454(a)(2), 98 Stat. 333, 375–76 (1984). The 1990 amendments further expanded the exception to cover certain educational benefit overpayments as well as obligations to repay funds received as educational benefits, scholarships, or stipends. *See* Federal Debt Collection Procedures Act of 1990, Pub.L. No. 101–647, § 3621(1), 104 Stat. 4933, 4964–65 (1990). The 1998 amendments are not relevant to the instant cases, which were initiated in 1997, because they apply only to cases commenced after October 7, 1998. *See* Higher Education Amendments of 1998, Pub.L. 105–244, § 971(b), 112 Stat. 1581, 1837 (1998).

## II Extension of a "Loan"

### A. *Definition of Loan Not Met*

With the policy concerns and relevant legislative history firmly in hand, we turn to the facts of these two cases to see if in either we can discern the kind of educational loan the statute envisions as an exception to discharge. Cazenovia and St. Rose maintain that by allowing Renshaw and Regner, respectively, to attend classes without paying tuition, the colleges extended to them an educational loan excepted from discharge by § 523(a)(8). The students do not dispute that their class attendance was educational. Instead, they contend that whatever services or goods the college gave them did not constitute a "loan" within the meaning of the statute.

 The analysis of any statute must begin, of course, with its plain language, at least where its language *is* plain. *See Patterson v. Shumate,* 504 U.S. 753, 757–59, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Mansell v. Mansell,* 490 U.S. 581, 588, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989). Because Congress did not define

the term "loan" for § 523(a)(8), we must interpret it according to its settled meaning under the common law. *See NLRB v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); *see also In re Merchant,* 958 F.2d 738, 740–41 (6th Cir.1992). The classic definition of a loan was articulated by our Court scores of years ago in *In re Grand Union Co.,* 219 F. 353, 356 (2d Cir.1914).[1] We paraphrase it as follows: To constitute a loan there must be (i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date. This definition implies that the contract to transfer items in return for payment later must be reached prior to or contemporaneous with the transfer. Where such is the intent of the parties, the transaction will be considered a loan regardless of its form. *See id.* Absent such an agreement, failure to pay a bill when due does not create a loan.

The transactions in these cases do not meet the *Grand Union* standard. Neither college entered into an agreement to extend credit to its student or to permit the student to attend classes in return for a payment of tuition at a future date. Rather, both Renshaw and Regner unilaterally decided not to pay tuition when it came due. The colleges, which then could have forbidden them to attend classes, chose not to do so. Nor did the colleges come to any agreement with Renshaw or Regner about future class attendance or an extension of credit.

### B. *Merits of the Individual Cases*

#### 1. *Renshaw*

 Cazenovia relies on the "Reservation Agreement" that Renshaw signed before enrollment as evidence of a loan. The

---

1. "In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together

with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form."

Agreement lists fees and charges and recites that Cazenovia has a security interest in the diploma and transcript, but it does not state that the student is entitled to attend any classes or obtain any other services without paying the charges when they are due. Its apparent purpose is to notify the student of the college's fees and to obligate him to pay those fees even if he later stops attending classes.

The Agreement specifies penalties for failure to pay fees when due. Significantly, it does *not* obligate Cazenovia to permit a student with unpaid bills to attend classes or to obtain other services from the college. Even if allowing a student to attend classes without prior payment can be characterized as an extension of credit, Cazenovia never promised to extend such credit to Renshaw, and it certainly did not reach a prior or contemporaneous agreement with Renshaw on the amount of credit to be extended.

Cazenovia's practice in executing the "Reservation Agreements" further undercuts its position. It routinely executes identical Agreements with each of its incoming students, without making any inquiry into their financial needs, creditworthiness, or intent to pay the college's fees on time. In addition, after listing the fees for the academic year, the Agreement expressly states "[t]he above does not reflect financial aid, if any." These circumstances indicate that the Agreement is not intended to create an educational loan. The bankruptcy appellate panel correctly characterized the Agreement as constituting Cazenovia's offer to sell the student goods and services at the specified prices rather than as an offer to make a loan. *See In re Renshaw*, 229 B.R. at 557.

The appellate panel also observed that were it to construe the transaction in *Renshaw* as a loan, the 19.2 percent annual interest rate specified in the Agreement (in the form of "service charges") would violate state law that sets an upper limit for loans at 16 percent annual interest. *See Renshaw*, 229 B.R. at 557, citing N.Y.

Gen. Oblig. Law § 5–501 (McKinney 1989); *see also* N.Y. Comp.Codes R. & Regs. tit. 3, § 4.1 (1999) (setting out maximum permissible interest rates under § 5–501). Not only is this argument forceful, but Cazenovia's response reinforces our decision. The college declares that the service charges are not usurious because "New York's usury statutes *do not* apply to defaulted obligations." Because the service charge accrues from the due date of Cazenovia's bill to the student, this statement suggests that the obligation is in default as soon as the due date has passed. The student's obligation therefore is simply to pay tuition on the due date, *not* to repay a loan. Renshaw's default on his tuition obligation created a debt. However, this debt did not arise out of a contract whereby Cazenovia College transferred money, goods, or services to Renshaw in return for his agreement to pay for them at some later date. Rather, the debt arose out of Renshaw's failure to pay tuition on the due date, *contrary* to his agreement with Cazenovia College. Without an agreement by the lender to make a transfer in return for a future payment, we cannot find a loan. Renshaw's default may not be construed after the fact to find a loan.

### 2. *Regner*

St. Rose insists that it extended credit to Regner because Regner agreed, in response to the college's demands, that he owed it money. However, the parties did not agree, prior to or contemporaneous with Regner's college attendance that the college would provide him with educational services and that he would pay for these later. Instead, they only agreed after the fact that Regner owed tuition. St. Rose asserts that Regner owes tuition for the fall 1993 semester. Unfortunately for the college, it relies entirely on Regner's letter of September 28, 1994, acknowledging his "past due account" and promising to pay the college in installments, and his stipulation of September 17, 1997 to the bankruptcy court acknowledging that he had

attended college without paying tuition. Both of these documents were executed well after the end of the fall 1993 semester, as was the November 10, 1994 stipulation Regner made in state court.

Thus, when Regner's tuition fell due and was not paid like Renshaw's, it simply became a past due account. It was not thereby transformed into a loan. The district court in *Regner* correctly concluded that the proof showed neither an exchange of funds nor an agreement between St. Rose and Regner for any extension of credit. The student did not execute a promissory note. The college simply acquiesced when Renshaw failed to prepay his tuition, deciding apparently on its own that Renshaw's tuition would be paid by financial aid or that the student would be responsible to pay himself. *See Regner,* 229 B.R. at 272; *cf. In re Alibatya,* 178 B.R. 335, 339 (Bankr.E.D.N.Y.1995) (student who leased dormitory facilities from NYU under a housing license agreement without any contemplation, constructive or otherwise, to alter the lessor/lessee relationship should NYU choose not to terminate the license, did not transform the debt into a loan by defaulting on payment). We decline to adopt the reasoning of *In re Stone,* 180 B.R. 499 (Bankr.M.D.Tenn. 1995), which held that a promissory note signed after the student's withdrawal from the university created a loan.

As a consequence, because the exception to discharge of a debt in bankruptcy set out in § 523(a)(8) must be narrowly construed, with the burden of proof on the creditor colleges to prove the claims not dischargeable, we hold that the colleges in the two appeals before us failed to prove that the transactions between them and the debtors constituted educational loans excepted from discharge in bankruptcy.

### C. *Support From Other Case Law*

Most courts that have addressed this issue, including the four below, have come to the same conclusion as we do here. Courts generally have held that nonpay-ment of tuition can qualify as an educational loan under § 523(a)(8) only in two classes of cases. In the first, funds have changed hands. For example, in *In re Joyner,* 171 B.R. 762, 763 (Bankr.E.D.Pa. 1994), the loan a college extended so that a student could pay for campus housing and a meal plan was ruled to be an educational benefit not dischargeable in bankruptcy. In the second, there is an agreement between the college and the student whereby the college extends credit to the student, permitting him to attend classes without paying tuition, in return for his agreement to pay tuition at a future date. Such an agreement may take the form of a promissory note, *see Merchant,* 958 F.2d at 740–41 (finding that there was a loan where student had signed promissory note for amount of indebtedness to university); *Johnson,* 218 B.R. at 450, 457 (similar); *In re Oldham,* 220 B.R. 607, 609, 611 (Bankr. N.D.Ill.1998) (same), or some other written agreement to repay a specific amount of money, in cash or in kind, *see In re Rosen,* 179 B.R. 935, 937, 939–40 (Bankr.D.Or. 1995) (loan where debtor signed agreement providing that in return for $3,313.44 worth of training, he would work as journeyman for a number of years or repay the sum in cash), or an oral agreement, *see In re Hill,* 44 B.R. 645, 646–47 (Bankr. D.Mass.1984) (short term credit for a term's tuition was educational loan where student, expecting financial assistance but unable to pay tuition before registration, negotiated permission to register for 30 days pending receipt of student loan); *In re DePasquale,* 225 B.R. 830, 833 (1st Cir. BAP 1998).

Of course, some cases involve both a transfer of funds and an agreement, and courts have found loans in those cases as well. *See, e.g., United States Dep't of Health & Human Servs. v. Smith,* 807 F.2d 122, 125, 127 (8th Cir.1986) (loan where scholarship money advanced on condition that medical student practice in physician shortage area after graduation or

repay the debt); *In re Avila,* 53 B.R. 933, 934, 937 (Bankr.W.D.N.Y.1985) (similar).

Conversely, where these indicia of a prior agreement are absent, there is generally held to be no loan. *See, e.g., In re Nelson,* 188 B.R. 32, 33 (D.S.D.1995) (no educational loan where student attended classes without paying tuition and after withdrawal signed "payment plan application and promissory note" acknowledging her indebtedness); *Alibatya,* 178 B.R. at 339 (no loan where student failed to pay student housing rent under lease agreement with university); *In re Peller,* 184 B.R. 663, 664, 668–69 (Bankr.D.N.J.1994) (no loan where student signed "Intent to Register" form similar to Agreement in *Renshaw* and then attended classes without having paid tuition); *Van Ess,* 186 B.R. at 376–77, 379 (no loan where student did not participate in student loan program or sign a written agreement providing terms for payment, but attended classes without having paid tuition); *In re Ellenburg,* 89 B.R. 258, 262 (Bankr.D.Ga.1988) (no loan where student attended classes under the mistaken belief that her mother was paying her tuition).

### III Analysis of Contrary Case Law

■ Not all courts have followed the line of cases holding that the absence of a prior agreement indicates no loan. In *In re Pelzman,* 233 B.R. 575, 580 (Bankr. D.D.C.1999), the bankruptcy court held that nonpayment of university housing fees constituted a loan under § 523(a)(8). The opinion does not describe the lease agreement in any detail, but to the extent *Pelzman* is inconsistent with the principles just outlined, we disagree with it. We also decline to adopt the reasoning of some cases that have reached the same conclusion as we do in these appeals. Thus, we view the approach of *In re Coole,* 202 B.R. 518, 519 (Bankr.D.N.M.1996), endorsed in *In re Meinhart,* 211 B.R. 750, 754–55 (Bankr.D.Colo.1997), that would require money actually to change hands before a transaction could be considered a "loan,"

as reading the exception to dischargeability too restrictively. Once an agreement has been reached the goods, college services or money may be advanced later, if it was the intent of the parties to enter into a loan agreement.

The colleges rely primarily on the Sixth Circuit's opinion in *Merchant,* 958 F.2d 738. The relevant issue there involved Merchant's obligation to her university for assistance with educational expenses. *Merchant,* facing the same issue we do here, based its definition of a loan on the *Grand Union* test. It read *Grand Union* to require that: "(1) the student was aware of the credit extension and acknowledges the money owed; (2) the amount owed was liquidated; and (3) the extended credit was defined as 'a sum of money due to a person.'" *Merchant,* 958 F.2d at 741 (citing *Hill,* 44 B.R. 645).

*Merchant* focused on two facts in reaching its decision: that the student had "signed forms evidencing the amount of her indebtedness before she registered for classes," *id.* at 741, and that the "assistance for educational expenses" the university provided her was evidenced by promissory notes payable to the university, *id.* at 739. There was also evidence that the university orally agreed to permit Merchant to attend classes while her tuition remained unpaid, and negotiated repayment schedules with her. *See* Appendix at 26–27, *Merchant,* 958 F.2d 738.

Some courts have distinguished *Merchant* on the basis of the promissory notes. *See Nelson,* 188 B.R. at 34; *Van Ess,* 186 B.R. at 377, 380 (same). It is not entirely clear from the opinion when Merchant executed the promissory notes; if it was after her school attendance ended, we would not find it relevant to the existence of a loan while she was attending classes. To the extent the Sixth Circuit based its decision on prior or contemporaneous agreements between Merchant and her university as to the amount of credit it would extend her and the amount and time of her future

repayment, it is easily distinguishable from the present cases.

## IV Extension of an Educational Benefit

 In addition to educational loans, § 523(a)(8) excepts from discharge "obligation[s] to repay funds received as an educational benefit, scholarship or stipend" and certain "educational benefit overpayment[s]." The colleges wisely do not rely on the "obligation to repay funds received" provision because it is undisputed that neither student received funds. However, Cazenovia argues that the "educational benefit overpayment" provision applies to its case.

Cazenovia proposes that we follow *In re Najafi*, 154 B.R. 185, 190 (Bankr.E.D.Pa. 1993), and read "for an educational benefit overpayment or loan" as including an educational benefit, an educational overpayment, or an educational loan. *See also Stone*, 180 B.R. at 501 n. 5 (adopting *Najafi*'s approach). The bankruptcy court and appellate panel below disagreed, reasoning that the phrase refers to a loan *or* an overpayment of an educational benefit. *See Renshaw*, 229 B.R. at 556 n. 8 ("An 'educational benefit overpayment' is an overpayment from a program such as the GI Bill where ... if the students receive payments after they have left the school, that is an educational benefit overpayment."); *see also Coole*, 202 B.R. at 519 (same). Because there was no overpayment here and we have already concluded that there was no loan, the present case does not fall within the meaning of the phrase. *See Nelson*, 188 B.R. at 33; *Alibatya*, 178 B.R. at 338 ("No linguistic gyration can twist a no payment or underpayment by [the student] into an overpayment by [the school].").

Cazenovia urges that the word "benefit" may not be used to modify a noun in the first phrase of § 523(a)(8) and then as an independent noun in the last phrase of the same subsection. While ingenious, this argument is unpersuasive. When a word can have various grammatical functions,

Congress is free to use any or all of them. In accordance with common English usage, when Congress wishes to indicate that a series of items is a set of alternatives, it consistently separates the items by commas and uses an "or" before the last one. That is precisely what it does elsewhere in § 523(a)(8) itself: "made, insured or guaranteed;" "educational benefit, scholarship or stipend." If Congress had meant "educational benefit, overpayment or loan," the statute would not read "educational benefit overpayment or loan."

Moreover, the term "educational benefit overpayment" was added as a unit in 1990. *See* Federal Debt Collection Procedures Act § 3621(1), 104 Stat. at 4964–65. The sensible reading of the phrase is therefore that it includes loans or overpayments of educational benefits. *See Peller*, 184 B.R. at 669; *Van Ess*, 186 B.R. at 380 (describing *Najafi*'s reading of the clause as "strained, and contrary to not only its plain language, but also the legislative history").

## CONCLUSION

For the reasons stated, we hold that neither Renshaw nor Regner received an educational loan or an educational benefit overpayment within the meaning of 11 U.S.C. § 523(a)(8), and accordingly, their respective debts to Cazenovia College and the College of St. Rose are dischargeable in bankruptcy. The order of dismissal in *Renshaw* and the grant of summary judgment in *Regner* are both therefore affirmed.