In re Stephanie Truvonne
HAWKINS, Debtor.

The President and Board of Ohio
University, Appellant,

v.

Stephanie Truvonne Hawkins, Appellee.

BAP No. EC–03–1490–SPB.
Bankruptcy No. 02–21313–B–7.
Adversary No. 02–02514–B.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on May 13, 2004.

Filed Oct. 25, 2004.

Donald M. Stevenson, Stockton, CA, for Ohio University.

Larry J. Cox, Fair Oaks, CA, for Stephanie Truvonne Hawkins.

Before SMITH, PERRIS, and BRANDT, Bankruptcy Judges.

## OPINION

SMITH, Bankruptcy Judge.

This appeal is from a final judgment discharging debtor Stephanie Hawkins' ("Hawkins" or "Debtor") debt to Ohio University ("Appellant" or "University") in her Chapter 7[1] bankruptcy case based upon the bankruptcy court's finding that the debt did not constitute an educational loan or benefit under § 523(a)(8). We AFFIRM.

### I

### FACTS

The State of Ohio subsidizes the education of medical students at the University, including out-of-state students, in order to improve the health care provided to Ohio residents by making more doctors available to them.[2]

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

2. This subsidy program is codified in Ohio Revised Code § 3337.14 which requires,

On or about July 30, 1986, Hawkins, a resident of California, submitted an application to the University College of Osteopathic Medicine.[3] The application package included a "Contract of Admission to the Ohio University College of Osteopathic Medicine" ("Contract"). The Contract provides, in pertinent part:

> This contract of admission is hereunto made between the President and Board of Trustees of Ohio University through the College of Osteopathic Medicine and the undersigned, a non-resident of Ohio for tuition purposes, or the purpose of granting admission to the College of Osteopathic Medicine, hereinafter referred to as the applicant.

> 1. The applicant agrees that in consideration of admission to the College of Osteopathic Medicine and for the medical education to be provided by the College of Osteopathic Medicine he/she will become licensed and practice medicine in the State of Ohio for a period of at least five (5) years from the date of completion ... of graduate medical education ....

> 3. The applicant agrees that in the event of his/her breach of this contract of admission for failure to fulfill the terms and conditions contained in paragraph 1 above and upon failure to fully correct this breach within a reasonable time ... the applicant shall pay to the College of Osteopathic Medicine for its use and benefit as liquidated damages, the total sum of the then existing subsidized costs, at the time of breach for the College of Osteopathic Medicine to pro-

vide medical education to one medical student to be determined by accepted accounting methods by the College of Osteopathic Medicine.

Contract of Admission to the Ohio University College of Osteopathic Medicine, dated October 30, 1986.

Hawkins signed the Contract with the University agreeing to the five-year commitment and was admitted to the program for the 1987 fall term. She successfully completed the program and, on June 7, 1991, became a Doctor of Osteopathic Medicine. However, Hawkins promptly returned to California without fulfilling her five-year obligation to practice medicine in Ohio.

In 1998, the University sued Hawkins in Ohio state court for breach of contract to recover the subsidized cost of educating one medical student at the time of the breach, which it calculated to be $94,160 plus interest. This calculation is based upon the estimated instructional subsidy for a full-time student enrolled at the University in 1996, the year by which Debtor was to have completed her five-year practice commitment to the State of Ohio.

The University obtained a default judgment against Hawkins on January 25, 1999 and obtained a sister state judgment in California on February 7, 2000. Hawkins filed a Chapter 7 bankruptcy on February 5, 2002 seeking to discharge the $159,-708.30[4] unsecured debt owed to the University. The debt to the University constitutes approximately 97% of her potentially dischargeable debt.

---

3. The parties have stipulated that there are no undisputed facts.

4. The University's judgment against Debtor includes interest running at 10% per annum, beginning January 15, 1998.

among other things, that 80% of students enrolled at the University be either Ohio residents or non-residents who have committed to practice medicine in Ohio for at least five years following graduation.

The University filed a complaint to determine the dischargeability of the debt pursuant to § 523(a)(8) and thereafter moved for summary judgment on the ground that Hawkins' debt is nondischargeable as a matter of law.

For her part, Hawkins did not assert dischargeability of the debt on "undue hardship" grounds and did not seek the discharge of her federally funded Health Education Assistance Loans ("HEAL").[5] Her sole defense to the debt of the University was that an obligation derived from a general educational subsidy does not constitute a student loan or educational benefit within the meaning of § 523(a)(8) and is, therefore, dischargeable. The bankruptcy court agreed with Debtor and granted summary judgment in her favor.

## II

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334 and § 157(b)(1) and (b)(2)(I). This Panel has jurisdiction under 28 U.S.C. § 158(c).

## III

## ISSUE

Whether the bankruptcy court erred in finding that Debtor's obligation to the University does not constitute an educational loan or otherwise fall under § 523(a)(8) exceptions to discharge.

## IV

## STANDARD OF REVIEW

The Panel reviews summary judgment orders *de novo.* *Paine v. Griffin (In re Paine)*, 283 B.R. 33, 36 (9th Cir.

BAP 2002). "In reviewing a summary judgment order, the task of an appellate court is the same as a trial court under Fed.R.Civ.P. 56." *HEMAR Serv. Corp. of America, Inc. v. Pilcher (In re Pilcher)*, 149 B.R. 595, 597 (9th Cir. BAP 1993) *citing Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1428 (9th Cir.1983). Rule 56 is made applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056. "Viewing the evidence in the light most favorable to the non-moving party, the appellate court must determine whether the bankruptcy court correctly found that there was no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Woodworking Enters., Inc. v. Baird (In re Baird)*, 114 B.R. 198, 201 (9th Cir. BAP 1990).

## V

## DISCUSSION

Under § 523(a)(8), a discharge under § 727 does not discharge an individual debtor from a debt for

> an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents
>
> . . .

§ 523(a)(8).

The bankruptcy court determined the obligation created by the Contract was

---

**5.** Although the parties stipulated that all facts are undisputed, the parties disagree on the amount of Debtor's HEAL loans. While Debtor contends that her HEAL loan balance is $98,721.22, the University refutes this claim. The only evidence in the record, a letter from

Sallie Mae Servicing Corporation, states that Debtor's HEAL loan balance is $6,758.49, and that she has other consolidated student loans amounting to $91,454.21. According to Debtor, the consolidated loans are all HEAL loans she incurred to finance medical school.

dischargeable because, as a matter of law, it was neither a loan nor was it repayment of an educational benefit under § 523(a)(8). More specifically, the court found the University failed to demonstrate that Debtor had received any financial accommodations in exchange for signing the Contract that would establish the basis for a loan. The court based its ruling on its findings that: 1) the University failed to quantify or otherwise provide evidence regarding the subsidy provided to Debtor; and, 2) the evidence suggested that Debtor's medical education was financed by approximately $94,000 in outstanding medical school loans unrelated to the Contract. Therefore, the court concluded, the substance of the transaction at issue could not be characterized as a student loan.

In addition, the court held that the subsidy did not qualify as an educational benefit because no funds were received by Debtor. Finally, the court interpreted the liquidated damages clause as a penalty rather than as compensation to the University for Debtor's non-compliance with the terms of the Contract.

Appellant claims that the bankruptcy court erred in failing to find: 1) that for purposes of § 523(a)(8), the terms "loan" and "educational benefit" are broad enough to include the education subsidy provided to non-resident medical students of the University in exchange for the service obligation, even though the subsidy was not in the form of a scholarship, stipend or other form of financial aid; and, 2) that the liquidation clause of the Contract is designed to compensate the University for the cost of subsidizing the education of one "replacement" medical student and does not constitute a penalty.

We agree with the bankruptcy court that the obligation created by the Contract is not the kind of educational obligation that falls within the discharge exception set forth in § 523(a)(8), though not for the reasons stated in the bankruptcy court's memorandum decision.

■ Generally speaking, debts that are potentially nondischargeable under § 523(a)(8) fall into two categories: 1) debts for educational benefit overpayments or loans made, insured or guaranteed by a governmental unit or nonprofit institution; or 2) debts for obligations to repay funds received as an educational benefit, scholarship or stipend. § 523(a)(8); *Mehlman v. New York City Bd. of Educ. (In re Mehlman)*, 268 B.R. 379, 383 (Bankr.S.D.N.Y. 2001).

## A. *Educational Loan*

■■ The term "loan" is not defined under the Bankruptcy Code and, therefore, it must be interpreted according to its settled meaning under common law. *Cazenovia Coll. v. Renshaw (In re Renshaw)*, 222 F.3d 82, 88 (2nd Cir.2000). In very general terms, a transaction may be properly characterized as a loan where, pursuant to a contractual relationship, one party transfers a defined quantity of money, goods, or services to another and the receiving party agrees to pay for the sum or items transferred at a later date. *In re Renshaw*, 222 F.3d at 88. The agreement to transfer items in return for later payment must be reached before or contemporaneous with the transfer. *Id.; In re Chambers*, 348 F.3d 650, 657 (7th Cir. 2003).

Most courts have construed the term broadly enough to include extensions of credit for tuition and not to require the actual delivery of a sum of money. *See, e.g., DePasquale v. Boston Univ. Sch. of Dentistry (In re DePasquale)*, 225 B.R. 830, 832–33 (1st Cir. BAP 1998) ("the proper focus under 11 U.S.C. § 523(a)(8) must be on the substance of the transac-

tion"). The *DePasquale* court noted that "[i]f a qualified institution or agency provides funds, credit, or financial accommodations to a debtor for educational purposes under a contemporaneous, mutual understanding of future repayment, the arrangement may be a loan within the statute's meaning, whether or not funds, as such were advanced." *Id.* at 833. *See also, United States Dept. Of Health and Human Servs. v. Smith,* 807 F.2d 122 (8th Cir.1986)(a scholarship grant awarded on the condition that a debtor practice medicine in a "physician shortage area" constituted an educational loan); *Roosevelt Univ. v. Oldham (In re Oldham),* 220 B.R. 607 (Bankr.N.D.Ill.1998)(a "loan" is not limited to those student obligations in which the creditor has directly or indirectly transferred money or some form of cash equivalent to the debtor); *Plumbers Joint Apprenticeship & Journeyman Training Comm. v. Rosen (In re Rosen),* 179 B.R. 935, 940 (Bankr.D.Or.1995)(debtor incurred a "loan" where he was provided with training worth $3,313 which could be repaid either in cash or by in-kind credits earned by working as a journeyman pursuant to a collective bargaining agreement); *North Dakota State Bd. of Higher Educ. v. Frech (In re Frech),* 62 B.R. 235, 240 (Bankr.D.Minn.1986) ("an educational loan [was] made" within the meaning of § 523 where a state program subsidized the education of prospective veterinarians by allowing North Dakota residents attending out-of-state schools to pay in-state tuition in exchange for an agreement to return to North Dakota to practice in the state for one to three years).

■ While an educational loan need not include an actual transfer of money or some form of cash equivalent to Debtor, in order to fall within the definition of a nondischargeable debt under § 523(a)(8), the loan instrument must sufficiently *articulate definite repayment terms and the repayment obligation* must reflect the value of the benefit actually received, rather than some other ill defined measure of damages or penalty. *See also, Navarro v. Univ. of Redlands (In re Navarro),* 284 B.R. 727, 733–734 (Bankr.C.D.Cal.2002)(An agreement holding the debtor liable for tuition did not constitute a loan where no liquidated sums were stated and where the debtor did not agree to pay a sum certain in the future).

The *Rosen* and *Frech* cases illustrate the point well. Both cases involved state-regulated educational programs providing for the repayment of a scholarship loan either in cash or by the fulfillment of specified service obligations. In each case, the bankruptcy court found that the debtors had received non-dischargeable educational loans under § 523(a)(8). *Rosen,* 179 B.R. at 940; *Frech,* 62 B.R. at 240. Like the Contract in the instant case, the agreements signed by the debtors in *Rosen* and *Frech* involved statutorily-regulated programs whereby students received no direct funds but agreed to repay the benefit received by them either through fulfillment of certain service obligations or by repayment of funds. *Rosen,* 179 B.R. at 937; *Frech,* 62 B.R. at 237. However, unlike the Contract here, the agreements in those cases specified the amounts that debtors were agreeing to repay, should they fail to fulfill their service obligations. *In re Rosen,* 179 B.R. at 937 ("debtor signed a Scholarship Loan Agreement with the Training Committee in which the debtor and the Training Committee agreed that the cost of training and the amount of the 'scholarship loan' for the nine month period in question was $3,313.44"); *Frech,* 62 B.R. at 236–37 (debtor executed four promissory notes pursuant to the statutory provisions in effect when he was in veterinary school totaling $17,720 which he

would be obligated to repay should he fail to fulfill his service obligation).

The bankruptcy court found that Debtor's obligation was not an educational loan under § 523(a)(8) because there was no evidence that Debtor received "funds, credit or financial accommodations" in exchange for signing the Contract. Memorandum Decision, dated September 16, 2003. The court apparently discounted evidence presented by the University which attempted to quantify the subsidy as evidence of the financial accommodation provided to medical students on a yearly basis and, instead, found that the sole purpose of the Contract was for admission into the college.[6] This finding is unsupported by the evidence. Importantly, Debtor herself admits receiving a tuition subsidy and does not refute the University's analysis or calculations in this regard. Though the outcome is the same, we disagree with the bankruptcy court's reasoning.

■ It is not the absence of evidence suggesting that Debtor received a financial accommodation from the University which causes the transaction to fall outside the scope of an educational loan under § 523(a)(8). Rather, it is the Contract's failure to quantify the educational benefit being conferred upon Debtor and to set forth adequate loan repayment terms reflecting that the amount being repaid is the value of the benefit received by Debtor, and not a penalty or damages calculation measured by something other than the benefit debtor received.

■ Certainly, a general subsidy could, under the right circumstances, qualify as a loan within § 523(a)(8).[7] For example, had the Contract provided for a quantifiable educational subsidy in exchange for Debtor's contemporaneous agreement to repay the value of the subsidized educational services she received from the University, either in cash or by practicing in the state of Ohio, the transaction might very well have qualified as an educational loan or benefit under § 523(a)(8). However, the arrangement here was structured quite differently. Under the Contract, Debtor was obligated to

> pay to the College of Osteopathic Medicine for its use and benefit as liquidated damages, the total sum of the then existing subsidized costs, at the time of breach for the College of Osteopathic Medicine to provide medical education to one medical student to be determined by accepted accounting methods by the College of Osteopathic Medicine.

Contract of Admission to the Ohio University College of Osteopathic Medicine, dated October 30, 1986.

6. Debtor argues in her opening brief that the purpose of the Contract was "... for tuition purposes, or the purpose of granting admission to the College of Osteopathic Medicine," and, since she did not receive any "tuition," it follows that the contract was created for her admission only. (Emphasis in original).

The University contends, however, that Hawkins received substantial consideration in exchange for her service commitment, in the form of *both* admission *and* a tuition subsidy. There is some evidence in the record supporting the University's contention. Most notably, Hawkins does not dispute receiving a tuition subsidy. So, even if one purpose of the agreement was for admission, the evidence suggests that the agreement *also* provided her with the benefit of the subsidy.

7. We disagree with Debtor's assertion that because the subsidy was a "general" subsidy paid to the University for the benefit of all medical students, rather than a financial accommodation paid directly to her, it is not an educational obligation under § 523(a)(8). Though not present in this case, there are likely circumstances under which a financial accommodation conferred upon a student by way of a "subsidy" (general or otherwise) could constitute a non-dischargeable educational obligation under § 523(a)(8).

■ By its terms, the transaction does not constitute a loan or benefit within the meaning of § 523(a)(8). First, the Contract does not require Debtor to repay the value of the subsidized educational services she received; rather, she is obligated to reimburse the University the subsidized costs of educating a *replacement* student calculated at some undetermined future date.[8] Second, the Contract is specifically designed to compensate the University for future damages (i.e., the cost of subsidizing another student at a later date) rather than to repay the institution for the benefit conferred upon Debtor. Third, the repayment obligation is expressly characterized as "liquidated damages." We agree with the bankruptcy court's conclusion that the liquidated damages clause in the Contract is in the nature of a penalty, and not repayment of a loan or benefit, because the damages are not calculated to approximate the benefit received by Debtor. *See, e.g., Rural Kentucky Med. Scholarship Fund, Inc. v. Lipps (In re Lipps),* 79 B.R. 67, 70 (Bankr.M.D.Fla.1987) ("Clearly, contractual penalties are not included among the exceptions to discharge set forth in 11 U.S.C. § 523.").

In sum, the agreement between the University and Debtor fails as an educational loan under § 523(a)(8) because it does not quantify the educational subsidy actually received by Debtor and does not create an obligation to repay the value of the benefit received.

B. *Educational Benefit*

■ Under § 523(a)(8), a discharge under § 727 does not discharge an individual debtor from a debt for "... an obligation to *repay funds received* as an educational

benefit." § 523(a)(8) (emphasis added). The University concedes that Debtor received no funds directly from the University or the state of Ohio. We agree with the bankruptcy court's holding that the subsidy received by Debtor does not qualify as an "educational benefit" under § 523(a)(8) because the plain language of this prong of the statute requires that a debtor receive actual funds in order to obtain a nondischargeable educational benefit. *See Cazenovia Coll. v. Renshaw (In re Renshaw),* 229 B.R. 552, 555 n. 5 (2nd Cir. BAP 1999) (recognizing that the exception for an obligation to repay an educational benefit requires the actual receipt of funds), *aff'd* 222 F.3d 82 (2nd Cir.2000).

## VI

## CONCLUSION

Based on the foregoing, we AFFIRM.

---

**8.** At the oral argument before this panel, counsel for the University conceded that under the terms of the Contract, the cost of subsidizing another medical student at the time of breach could be significantly higher than the actual cost of subsidizing Debtor's education.